John P. MORSE, Respondent,

v.

Barbara D. VOLZ, Personal Representative of the Estate of Inga H. Morse, Deceased, Appellant.

No. WD 42692.

Missouri Court of Appeals, Western District.

May 7, 1991.

Theodore M. Kranitz and Keith S. Rhodes, St. Joseph, for appellant.

Keith W. Ferguson, Brown, Douglas and Brown, St. Joseph, for respondent.

Before KENNEDY, P.J., and SHANGLER and GAITAN, JJ.

SHANGLER, Judge.

The plaintiff, John P. Morse, brought a petition to contest the will of his deceased father, Marvin W. Morse, on grounds that the decedent was not of sound and disposing mind and memory at the time he executed the instrument, and that it was the result of the undue influence of Inga H. Morse, his then wife. The defendant Inga H. Morse died during the pendency of the action, and her daughter, Barbara D. Volz was substituted as personal representative of the estate of the deceased Inga H. Morse. The verdict of the jury was that the document was not the last will and testament of Marvin W. Morse. The personal representative appeals the judgment entered on the verdict.

### The Evidence

Marvin W. Morse died on October 11, 1986 at the age of 78. He practiced medicine until retirement in 1973. His first wife, Mildred Morse, predeceased him on December 31, 1978. The plaintiff, John P. Morse, was their only child. He is an orthopedic surgeon. Marvin W. Morse married Inga H. Morse [then, Cunningham] on May 12, 1984. Barbara D. Volz is a child

of her first marriage. Inga died on December 17, 1987.

The decedent and his first wife, Mildred, enjoyed a loving relationship during their marriage. He depended on her during her life and upon her death, came to depend on his daughter-in-law, Claire. The decedent's son, John, and his wife, Claire, lived in Mississippi. When Mildred suffered a massive stroke in December of 1978, John and Claire came to St. Joseph to be with the father. During Mildred's stay in the hospital,. the decedent began to drink more and refused to visit his wife. He would shut himself up in his den with a bottle of scotch, rather, and took long, solitary walks. He became increasingly hostile toward others: He struck his grand-daughter, screamed and shouted in fits, was unreasonable with the neighbors, and merely stormed out of the house, then came back, grabbed a bottle, and went to his room. The plaintiff son, John, had never seen the father like this. He had always been a kind and understanding man. The decedent was then seventy years old.

Mildred died on December 31, 1978. The decedent refused to make the funeral arrangements, except to select the casket, and refused to attend either of her visitations. He explained, he could not stand to see her like that. After her death, John and Claire decided to return to St. Joseph to stay with the father because he was "in a strange state" and they were concerned that he would not be able to take care of his affairs. From that time until the decedent's marriage to Inga Cunningham, Marvin and Claire had a "very nice" relationship. Claire visited him several times a week, ran errands for him, took him to the store, lunched together, and otherwise kept in touch with him by telephone. John visited his father after the close of office hours to go over the day's events. This continued for about a year and a half after the mother's death. The father then became friends with a neighbor, Helen Doring, and thereafter, the son visited him about twice a week. The father also spent Sundays with the son and his family.

During the five years that followed his wife's death, the decedent's eyesight deteriorated markedly. And so did his behavior. Prior to her death, he had been charming and thoughtful. Thereafter, he became bitter and hateful and turned against those who seemed to care for him the most. He became depressed, reclusive, resigned from clubs, and even refused to talk to old friends. He began to drink two fifths of scotch per week, and continued that for the rest of his life. The decedent also became increasingly concerned over money to the extent that he moved into the basement of his house and slept on a cot in order to save on the cost of utilities. He had to go upstairs in order to use the shower or toilet. He spoke frequently about being cheated out of money. The decedent also experienced current event memory lapse, and was unable to recall events of past weeks, days, or hours.

There were numerous other incidents of uncharacteristic behavior. The decedent threw a newspaper in the face of his sister-in-law because she did not give him enough attention. Then, after his house was broken into in 1983, he began to prowl his house at night with a .20 gauge shotgun. He changed clothes in front of his daughter-in-law in her family room. He drove a car, although he was unlicensed. He worked with power tools two inches from his nose, and failed to recognize his son on numerous occasions.

The evidence was not clear as to when the decedent and Inga began to see each other socially. In her deposition, Inga stated that she first met the decedent in 1957 when employed with Methodist Medical Center in St. Joseph. Inga's son, Boyd Cunningham, recalled he first saw them together at his mother's home, in 1980 or 1981. Another witness, the decedent's cousin Arlene Miller from the State of Oregon, testified that on his visits to her in 1982 and 1983—after the death of his first wife—he spoke to her of a "very kind lady." He did not know what to do, because this lady "was paying a lot of attention to him," but he was not interested in her, and "hoped that she would leave him alone." There was also the testimony of

Zelma Edwards, an acquaintance of Inga, that Inga and the decedent began to participate in social activities together in about 1985. The first such occasion was a luncheon which Inga arranged in order to present the decedent to Zelma. At that time Inga was romantically involved with another man, Eldon Zion. Following the luncheon, Inga telephoned Zelma and stated her intention to begin dating the decedent. She told Zelma that she loved Eldon, but that he had no money and was not a Mason. She would continue to see him nevertheless until she got "a commitment or something" from the decedent.

According to the testimony of Claire Morse, the contestant's wife, the decedent first mentioned Inga several months after his wife's death in 1978. He said then that "his friend Mrs. Cunningham had called to see how he was doing." Claire related other conversations with the father-in-law that mentioned Inga. In 1982 Inga had invited him to a dance, but he did not accept. In 1983 she inquired as to whether he was interested in the purchase of a new house. She had understood that he was looking for a smaller home, and that a neighbor had placed such a house on the market. The decedent viewed the home, but decided that it was too expensive and the basement was too small for his tools. Then, in 1984, the decedent mentioned to her during a telephone conversation that he and Inga were going to marry. He had never told Claire that they were dating, and Claire knew of her only by name. The contestant, decedent's son, learned about the engagement from his wife, Claire. At that time, both the son and his wife saw the decedent regularly, two or three times a week.

After that announcement, Claire invited her father-in-law and Inga to lunch in order to meet her. They told her then that the wedding would be in June, after Claire and John returned from Italy. They invited him to join them on the trip, but the decedent would have nothing to do with those "wops." A few days later, Claire went to the decedent's home to pick up some items that had been promised to her and her daughter. Claire asked him then if he had given Inga her deceased mother-in-law's ring. He told Claire that he had reset Mildred's [his first wife's] stone and given the ring to Inga because "it was just laying around gathering dust in the lock box." He then told Claire that the wedding date had been advanced to May. Claire reminded him that she and John would still be in Italy. He responded simply: "These women have a way of changing their minds." The decedent told her that he and Inga had been to her attorney and "everything has been taken care of to protect all of our children."

Claire was upset at the hurry of the pending marriage. She told her husband about the ring, about the consultation with the attorney, and about the change in the wedding date. John became angry, retired to write some notes, and delivered them. One note was to the father and the other to Inga. John had tried to find his father at home to express to him what the father had done to John and his family. It was, John explained, as if all at once he, his wife and daughter were excluded from the father's plans, and no longer existed. It was his thought that the special diamond his father had given Inga was his mother's, and "did not belong to anyone else." It was meant for "the women in the family," and now for his daughter Nancy. The note to the father expressed the feeling that, because he had given "this woman my mother's special ring," and "could not see fit to have us at his wedding," the father no longer wanted them in his family. The purpose of the note, John explained, was to "shock him back into reality."

The note from the son to Inga was in evidence:

> Ms. Cunningham,
>
> I consider your marriage to my father a farce, and an obvious attempt to acquire his wealth.
>
> *I disapprove.*
>
> *You* are not now and never will be welcome in my home.
>
> A woman who wears a dead *loved* woman's ring is avaricious in the worst meaning of the word.

I have nothing but contempt for you.
John P. Morse, M.D.

John never visited his father again after the delivery of the notes. Their relationship remained broken.

The decedent and Inga were married on May 12, 1984, a Saturday. Inga's cousin, Agnes Schwalm, and her husband Milton Schwalm, witnessed the wedding ceremony. After that ceremony, the Schwalms transported the decedent and Inga to the office of attorney Al Stover, where they witnessed the execution of his will by the decedent. Stover was the attorney who had prepared the prenuptial agreement for the decedent and Inga some weeks earlier, in April of 1984. He expressed to Stover then that he wanted a will drawn. They consulted twice about the will before the occasion of its execution.

Stover testified that the terms of the will were "entirely instructions from my client," the decedent. There was "nothing at all unusual about him," Stover said. The decedent indicated that he wanted to make a will, and he "knew exactly what he wanted to do." They discussed if he might be interested in a trust instead of a will, and the decedent told him he just wanted a will. Stover repeated, "I was very satisfied that he knew what he was doing, yes." He informed the attorney that the value of the estate was about $400,000 and a home. Stover asked about his "family situation," and the decedent told him that he had a son, that the son had a wife, Claire, and that they had a daughter, Nancy. They were not discussed, however. The decedent told the attorney that he wanted to leave everything to Inga because, as the will expressed, John had no need of the estate and the decedent wanted to provide for his wife, Inga. Stover received from the decedent "the feeling and indication . . . that he and his son were not on real good terms." Stover advised the decedent that the terms of the will rendered the prenuptial agreement valueless. The decedent understood.

The will was signed on a Saturday, a day when the secretary was not at work. The decedent joined Stover in his office while Inga and the Schwalms remained in the reception area. Stover went over the will with the decedent who also read it over "rather carefully" with the aid of a small magnifying glass. This done, after about 15 or 20 minutes, Stover then asked him, "Is this what you want?" The decedent replied, "Yes." Stover repeated, "I was satisfied that he knew exactly what he was doing." Stover added, "[A]nd quite frankly, he was quite capable of making a will."

Inga had also accompanied the decedent to Stover's office at least on one of the two prior occasions. Stover had drawn up a real estate contract for Inga two or three years before. He continued to represent her as the personal representative of the decedent's estate, until her death.

The will left everything to Inga if she survived him, and to her children, Boyd Cunningham and Barbara Volz, if she predeceased him. The will expressly stated that the decedent left nothing to son John because "he does not have the need for what I may leave in my estate." The decedent had never met Barbara before the wedding day, but they had spoken once by telephone. He had met Boyd a dozen or so times during the year before the wedding.

Inga testified by deposition that the decedent had proposed marriage to her in 1981. She testified also that the wedding date of May 12, 1984, was chosen by him so that her children could attend, and that no other wedding date had ever been discussed. She said that the decedent did not drink alcohol before the marriage. She said also that not until he died, did she know that the decedent had left everything to her. She denied that the decedent had promised everything to her if she would marry him.

Zelma Edwards testified that Inga told her that Doc was an alcoholic. Inga had told her also shortly after the honeymoon that the decedent had left everything to her in his will. Inga's sister, Agnes, testified that the decedent promised to give Inga everything if she married him, and that the wedding date was originally set for June. There was evidence also that Inga and Agnes had a disagreement over a table in 1985, after the wedding.

A number of expert witnesses were presented concerning the decedent's mental health. Dr. Gerald Vandenburg, a clinical and forensic psychologist, testified that decedent suffered from depression during the years following the death of his first wife and that he was probably fairly dependent and lonely. The behavior of the decedent also suggested early senile degeneration or brain dysfunction, and suggested also organic brain dysfunction caused by Alzheimer's Disease, where the actual brain tissue begins to deteriorate. This results in a gradual, slow degeneration in brain function. He also testified that the decedent may have suffered from transient ischemic episodes, which are temporary interruptions of the blood oxygen supply to the brain. In the case of severe episodes a step-like deterioration in ability to think and function intelligently is experienced. Such conditions are significantly complicated by depression and affect a person's soundness of mind. Notwithstanding such testimony it was impossible for Dr. Vandenburg to say whether decedent was uniformly and consistently affected by such defects after his wife's death. Rather, persons so afflicted "have good days and bad days."

Dr. Wallace McDonald, a practitioner of internal medicine, decedent's treating physician, testified that the decedent suffered from high blood pressure since 1974. High blood pressure, over time, can lead to strokes and problems in the brain. When the decedent was hospitalized in 1986, he was still suffering from chronic high blood pressure.

Dr. Nancy Ansevics, a doctor of education psychology and counseling, could not rule out that the decedent was suffering from organic neurological disease or defect. Very often, persons with sensory problems, such as poor eyesight, have organic damage that contributes to that deficit. The hypothetical facts posed, Dr. Ansevics answered, did not provide a sufficient basis to diagnose either Alzheimer's "or any other defect like psychosis."

The plaintiff son never attempted contact with the decedent father again, although on two occasions after the date of the will he came upon the father in a public place. He did not visit the father in the hospital during his final illness, although the son, as a physician, was there during that time. Nor did he attend his father's funeral.

## Points on Appeal

The proponent Volz asserts numerous points of trial error. They include contentions that are reviewable and others that are not. The points that the court improperly denied her motions for summary judgment and for directed verdict at the close of the contestant's evidence because there was not sufficient proof to justify submission of the issues of unsound mind and undue influence to the jury are not amenable to review. The denial of a motion for summary judgment is interlocutory and is not an appealable order. *Desloge v. Desloge*, 617 S.W.2d 486, 487[1] (Mo.App.1981). A motion for directed verdict at the close of the plaintiff's evidence is waived by a defendant who, as here, presents evidence thereafter. *Polovich v. Sayers*, 412 S.W.2d 436, 438[2] (Mo.1967).

The proponent contends also that the trial court erred in the denial of her motions for directed verdict at the close of all the evidence and for judgment notwithstanding the verdict. These points present the question of whether the contestant John Morse proved a submissible case and are amenable to review on the merits. *School Dist. No. 30 v. U.S. Gypsum Co.*, 750 S.W.2d 442, 445[1] (Mo.App.1988). The direction of a verdict is proper only if upon view of the evidence in the light most favorable to the non-moving party, reasonable minds could not differ as to the proper verdict. *Fricke v. Valley Prod. Credit Ass'n*, 721 S.W.2d 747, 752[1, 2] (Mo.App. 1987).

The essential contention of error on this appeal is that the case was not submissible to the jury because there was not sufficient evidence that the testator was of unsound mind at the time he executed the instrument as his last will and testament, or that it was the result of the undue influence of Inga H. Morse, his then wife.

### Testamentary Capacity

A testator who has enough mind and memory to understand the ordinary affairs of life, to know the nature and extent of his property and who are the natural objects of his bounty, his natural obligation to those persons, and that he is giving his property to the persons mentioned in his will, has testamentary capacity. *Crum v. Crum*, 231 Mo. 626, 132 S.W. 1070, 1073 (1910); *Rex v. Masonic Home*, 341 Mo. 589, 108 S.W.2d 72, 84[4] (1937). Such capacity must exist at the time the will is executed. *Proffer v. Proffer*, 342 Mo. 184, 114 S.W.2d 1035, 1040[3, 4] (1938).

The right to dispose of property by will as the testator may choose is one that the law does not readily deny on the ground of lack of testamentary capacity. *Heinbach v. Heinbach*, 274 Mo. 301, 202 S.W. 1123, 1130[16] (1918). It is the settled rule of evidence in such cases that occurrences and circumstances close to the time of the execution of the will, both before and after, which tend to shed light on the issue of testamentary incapacity at the time of the execution of the will, are competent. That said, it is nevertheless not what may have been the testator's mental state at the time of the testamentary act that determines legal capacity to make the will, but what the mental state actually was. *Schoenhoff v. Haering*, 327 Mo. 837, 38 S.W.2d 1011, 1015[5–7] (1931); *Glover v. Bruce*, 265 S.W.2d 346, 352[2, 3] (Mo.1954).

The proponent Volz argues that most of the evidence, as already recounted, was not probative of either the lack of testamentary capacity of the testator at the time the will was executed or whether the testamentary act was the result of the undue influence of his then wife, Inga. She argues that any aberrancies and other incidents of uncharacteristic behavior that may have marked the testator's behavior after the first wife's last illness and death were too remote from the date of the execution of the will to be of value as proof of the soundness of his mind at that time. She argues moreover that they were spasmodic and not habitual, remote in time from the testamentary act and, in any event, mostly explained as eccentricities of advancing age. The lessened eyesight, high blood pressure and other conditions of reduced health, she asserts, never impaired his capacity to look after his substantial property or his daily needs. In short, the proponent Volz contends that a submissible issue of lack of testamentary capacity of the testator at the time he signed the will was not proven.

The contestant John Morse acknowledges the general principle that sickness, old age and eccentricities are not sufficient in themselves to "overthrow a will on grounds of mental incapacity," but that each may be taken into consideration with other facts on that issue. He argues that the evidence, considered in a manner most favorable to the verdict, "sets forth many facts other than old age and eccentricities" that reflect a lack of mental capacity of the testator on the date the will was executed. The argument then recapitulates the full range of the evidence of depression, reclusiveness, ill-temper, memory lapses, the reported incidents of his failure to recognize son John, the neglect of the testator to disclose to son John the fact of his courtship with Inga and then the plan for their impending marriage—and the medical evidence as well. This narrative, however, does not undertake to identify those "many facts"—other than those attributable to "illness, old age and eccentricities"—from which a permissible inference of the testamentary incapacity of the testator derives. Instead, the respondent contestant cites four cases, *Proffer v. Proffer*, 342 Mo. 184, 114 S.W.2d 1035 (1938); *Machens v. Machens*, 263 S.W.2d 724 (Mo. 1953); *Adams v. Kendrick*, 321 Mo. 310, 11 S.W.2d 16 (Mo.1928) and *Higgins v. Smith*, 150 S.W.2d 539 (Mo.App.1941). These decisions all confirm the accepted rule that evidence of the sickness, old age and eccentric conduct of a testator, taken alone, do not suffice to overthrow a will on the ground of mental incapacity—but each may be considered with "other facts" to come to that determination.

The "other facts" in *Proffer* were the transformation of the elderly, disease-

afflicted testator from a shrewd, industrious and honest farmer into one who could not manage the simplest business transaction and who practiced petty thievery against his neighbors. *Id.* 114 S.W.2d at 1038. There is no comparable proof as to the testator here.

In *Machens* the physician who had treated the 87 year old testator for a series of physical impairments over a span of years described his mental condition, only five days before the will in contest was executed, as one of "confusion," without capacity to "answer questions coherently"—a condition of "senile dementia." It was his opinion that the testator was not of sound mind on the date the will was signed. That medical diagnosis and impairment of brain and mental function was confirmed and reinforced by yet another treating physician. It was that medical evidence "based on actual observations" and "not merely on hypothetical questions" that justified the submission of the issue of testamentary capacity to the jury. *Id.* at 728[1]. In this case, the only opinion attempted by the contestant John Morse as to the mental state of the testator on the date the will was signed was by a hypothetical assumption of the facts in evidence as posed to his witness, Dr. Gerald Vandenburg, a clinical and forensic psychologist. Dr. Vandenburg had never treated or observed the testator. As already noted, Dr. Vandenburg concluded that whatever opinion of brain dysfunction the facts hypothetically assumed otherwise justified, "it was impossible for him to say" that the testator was "uniformly and consistently affected by disease defect from and after the death of his wife."

The only opinions as to the testator's mental state, and hence his testamentary capacity at the date of the testamentary act, came from witnesses presented by Volz, the proponent of the will. They came from Dr. Wallace McDonald, the testator's personal physician, and Attorney Stover, who drafted the will. The testator had consulted with Dr. McDonald in 1984 about conditions of the prostate and high blood pressure. That consultation and treatment continued until October of 1986, when he referred the testator to a surgeon to correct the prostate condition. It was while the testator was in the hospital recovering from that surgery that he died. Dr. McDonald testified that throughout those twelve years he never observed anything in the behavior of his patient that would suggest "trouble with the brain" or the need for psychiatric treatment. Stover testified, as noted, that the testator "knew exactly what he wanted to do" in his instructions as to the terms of the will, and that at its signing the testator read the instrument over "rather carefully" with the aid of a magnifier. The attorney concluded that the testator was then "quite capable of making a will." *Machens* is no precedent for the submissibility of the issue of testamentary capacity under the evidence presented to the jury.

In *Adams*, in addition to all else, the "refusal [of the aged testator] to eat for days at a time, his crying without any cause, his continual brooding over imaginary troubles, and his method [of the aged testator] of living in dirt and filth at the time the will was executed"—despite his more than ample property—proved a submissible case of testamentary incapacity. *Id.* at 24[10, 11]. In *Higgins*, the testatrix was a diagnosed psychoneurotic and committed to a hospital for treatment of that illness. In the course of the trial, the contestants adduced evidence not only of unsound mind, but that the will was the result of an insane delusion. The jury found that the paper executed by her was not her last will and testament, but the court found that the verdict was prejudiced by the evidence of insane delusion, and remanded for retrial on the issue of soundness of mind only. *Id.* at 544[11–15]. Neither *Adams* nor *Higgins* bears sufficiently as precedent of law, or as analogy by the evidence, on the submissibility of the soundness of mind issue in this case.

The contestant Morse, to support the submissibility of the issue, relates that the purported will, which leaves everything to the second wife, Inga, works to disinherit the only child of the testator—an unnatural disposition. He cites the principle that "[a]

harsh and 'unnatural disposition' by will 'is a circumstance which tends to discredit the maker's testamentary capacity.'" The wife of a testator, even the second wife, however, is also a natural object of his bounty, and the testator has the right to dispose of his property to her by will—even to the exclusion of the nearest relative. *Heinbach v. Heinbach*, 202 S.W. at 1130[16]. It was the testimony of Attorney Stover that the testator told him he had a son, John, who was married and had a daughter, Nancy. The testator left everything to his new wife, Inga, because, as the will expressed, John had no need of the estate. The purpose of the will was to provide for Inga.

The evidence presented at the trial by the contestant, as well as that evidence of the proponent of the will that aids the verdict in favor of the contestant, considered as a whole do not sustain the submission of the issue of the testamentary capacity of the testator at the time the will was executed. There is no room for the disagreement of reasonable minds. *See, e.g., Archambault v. Blanchard*, 198 Mo. 384, 95 S.W. 834 (1906); *Heinbach v. Heinbach*, 274 Mo. 301, 202 S.W. 1123 (1918); *Williams v. Lack*, 328 Mo. 32, 40 S.W.2d 670 (1931); *Callaway v. Blankenbaker*, 346 Mo. 383, 141 S.W.2d 810 (1940); *Walter v. Alt*, 348 Mo. 53, 152 S.W.2d 135 (1941); and *Glover v. Bruce*, 265 S.W.2d 346 (Mo.1954).

## Undue Influence

■ The jury verdict that the document in issue was not the last will and testament of Marvin Morse rested also upon a submission that he signed it under the undue influence of Inga Morse. Undue influence means such influence as destroys the free choice of the person making the will. MAI 15.03. To break the will the evidence must show such influence as amounts to force, coercion or overpersuasion sufficient to destroy the free agency and will power of the testator. *Sehr v. Lindemann*, 153 Mo. 276, 54 S.W. 537, 540 (1899); *State ex rel. Smith v. Hughes*, 356 Mo. 1, 200 S.W.2d 360, 363[4] (banc 1947). The burden to prove undue influence rests upon the contestant, a burden that is met only by the presentation of substantial evidence. *McCormack v. Berking*, 365 Mo. 913, 290 S.W.2d 145, 150[2–5] (1956); *Switzer v. Switzer*, 373 S.W.2d 930, 932[2] (Mo. 1964).

■ A presumption arises that the testator was unduly influenced by the beneficiary when the evidence shows (1) a subsistent fiduciary relationship between the testator and the beneficiary, (2) that the beneficiary was given a substantial benefit by the will, and (3) that the beneficiary was active in causing the execution of the will. *Hodges v. Hodges*, 692 S.W.2d 361[7] (Mo. App.1985). In a will contest, the presumption of undue influence that arises from such evidence is one of substance, and raises an inference for the jury. *Pulitzer v. Chapman*, 337 Mo. 298, 85 S.W.2d 400, 412[11] (banc 1935). A fiduciary relationship is not shown merely because the testator and beneficiary are husband and wife. That is because in any proper sense, the spousal relationship betokens a reposed mutual confidence that engenders the flow of generosity and affection from one to the other. *Snell v. Seek*, 363 Mo. 225, 250 S.W.2d 336, 343 (1952). It follows that "a husband or wife may properly influence the making of a will ... by the other for his or her own benefit, so long as the influence is not exercised in an improper manner or by improper means, ... [and] is not sufficient to have, in effect, substituted the will of one for the other." *Id.* The distinctive mark of a fiduciary relationship is a trust and confidence reposed by one person in the other, especially in regard to transactions of property and business. *Doll v. Fricke*, 237 Mo.App. 1148, 171 S.W.2d 755, 757[3, 4] (1943); *Cockrum v. Cockrum*, 550 S.W.2d 202, 208[16] (Mo.App.1977).

■ There was no substantial evidence, by these definitions, to support an inference that the paper executed by Marvin Morse as his testament was the product of the undue influence of Inga Morse, either as his wife or as a person on whom he relied upon and confided in matters of property and business.

The contestant John Morse argues that the evidence that Inga knew the contents of Marvin Morse's existing will and that he promised her everything if she married him, that the will was drafted by Inga's attorney, signed in his office after the wedding ceremony, that her cousin drove them to the attorney's office for that purpose, and that although the testator had never met Inga's daughter, his will left half of the estate to her should Inga predecease him—are "factors [that] alone make a submissible case of undue influence." This inference, he argues, is reinforced by the other evidence, that relates to the testator's mental and physical condition, "Inga's power and opportunity to influence [the testator]; an unnatural disposition to her *and* her children with nothing to John;" and other incidents already fully recounted. The contestant argues even, that "[a] confidential relationship between [the testator] and Inga obviously existed since they were engaged at the time the will was prepared."

■ The most that can be said of the evidence is that Inga sought the marriage with Marvin Morse because of his money. Her power and opportunity to unduly influence the testator was not enough to submit the issue to the jury, absent its active exercise by Inga to that end. *State ex rel. Smith v. Hughes,* 200 S.W.2d at 363[3, 4]. A wife who urges and solicits her husband to make a will in her favor does not, by that fact, exercise an undue influence over its execution. Nor, to prove the issue, is it enough that the beneficiary of the will [there, also the second wife] dominated other aspects of the testator's life in ways adverse to the contestant [there the children of the first marriage]. Nor even does the fact that the wife "procured the scrivener and was present when the will was executed . . . support an inference of undue influence." *Hammonds v. Hammonds,* 297 S.W.2d 391, 396[7, 8] (Mo.1957); *Jones v. Jones,* 260 S.W. 793, 797[1–3] (Mo.App. 1924). Also, "the fact that a husband bequeaths all of his property to his wife to the exclusion of his children by a former marriage is not an unnatural disposition," and does not support the inference of undue influence. *Id.* at 394[2–6]. In the context of the proof, moreover, the testamentary disposition of his property, was concluded only after the only child of the testator, the contestant John, renounced his filiation should the father marry Inga. It is not evident what "natural disposition" of property is owed by a father to a son who has disclaimed their kinship.

The contestant John Morse cites two decisions to sustain the argument that a fiduciary relationship subsisted between Inga and the testator, and that the presumption of undue influence was established by evidence that Inga actively procured the benefaction of her husband's will. The reference is to *Disbrow v. Boehmer,* 711 S.W.2d 917 (Mo.App.1986) and *Rhoades v. Chambers,* 759 S.W.2d 398 (Mo.App.1988). The facts in those cases and the case under review are so disparate as to render those decisions irrelevant as legal precedents. In *Disbrow* as well as in *Rhoades,* the benefitted family member was not only entrusted with the financial and property affairs of the testator and regularly exercised those matters of confidence, but also actively procured the execution of the will that granted the benefaction. On established principles, therefore, there was both proof of a fiduciary relationship between the testator and beneficiary and a presumption in law, and hence a submissible issue, that the will was the result of the undue influence of the beneficiary.

The circumstances presented to the jury, rather, amount to neither substantial evidence of a fiduciary relationship between the testator and beneficiary at the time the will was signed, nor that Inga Morse so dominated and controlled the mind of Marvin Morse as to destroy his free agency in the making of the will.

The judgment is reversed and remanded with instructions that the trial court enter a judgment that the document in issue is the last will and testament of Marvin W. Morse.

All Concur.