In re the ESTATE OF Richard
Lee HAGUE, Sr., Plaintiff.

Sue NILES, et al., Respondent,

v.

Faith MacARTHUR, Personal Representative and Individually, Appellant.

No. WD 48957.

Missouri Court of Appeals,
Western District.

Feb. 7, 1995.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 28, 1995.

Marilyn R. Gaeth, Columbia, for appellant.

Charles W. Franklin, Fulton, for respondent.

Before KENNEDY, P.J., and BRECKENRIDGE and SPINDEN, JJ.

KENNEDY, Presiding Judge.

This is a will contest. The children of Richard Hague, Sr., the decedent, challenge his will dated April 29, 1992, of which Faith MacArthur was the sole beneficiary and was named as personal representative. Faith MacArthur was the decedent's companion and co-habitant at the time of his death. The children claim the purported last will was the product of undue influence practiced by Faith MacArthur upon their father, and also that he lacked mental capacity to make a valid will.

After the jury trial, the jury rejected the will. Faith MacArthur has appealed, claiming the evidence does not support the verdict of the jury.

The evidence showed the following state of facts. Where a person's mental condition is the issue, it is rarely possible to state the facts of the case briefly, for the answer depends upon an accumulation of many instances of the person's behavior and speech, over an extended period of time.

Richard Hague, Sr., and Barbara Hague had been married many years when Barbara became ill with cancer, and, after a lengthy illness, died on July 13, 1991. During her final illness, as she was a patient in the hospital, Richard himself was diagnosed with cancer, which would in time prove to be fatal. He was a patient in the same hospital as his wife.

Richard and Barbara had four adult children, who are the contestants here.

Richard at this time was 61 years old. He had earlier followed the concrete finisher's trade, but was disabled in an accident in 1986. (A workers' compensation claim was settled for $30,000 in 1992, during the summer before his death.) He and Barbara had then become engaged in the antiques and flea market business. They bought these goods mainly at auctions, and resold them in flea markets. There is evidence Richard could not read or write, but, if so, it did not prevent his conducting the ordinary affairs of life without noticeable disadvantage.

After Barbara's death, Richard was despondent. His cancer did not respond to therapy. He and his children assumed the cancer would be fatal. He sold most of his tangible personal property at auction, including an accumulation of antiques and flea market goods. This was about Labor Day, 1991, before he had met Faith. The property was located at three different flea market loca-

tions—Fulton, Midway, and Business Loop (Columbia)—and in Richard's residence garage. At the same time, he sold his household goods, and his house was left bare of furnishings, except for minimum essentials. This auction fetched an estimated $30,000. Richard distributed $5,000 to each of three of his four children. To one of them, his daughter, Sue, he gave an additional $5,000 to keep for him against a time of his need for it. A fourth child, a son, was in prison at this time, and did not share in the distribution. Richard's purpose in liquidating the property and in making gifts to his children was to avoid probate court involvement after his death.

An incident in connection with the auction is cited by the children as evidence of their father's mental incompetence. While the auction was in progress, he angrily stopped the auction and discontinued it, complaining the goods were not selling high enough. The children considered their father's action bizarre and uncharacteristic of him. The auction was rescheduled later and was completed two weeks later.

Richard also behaved uncharacteristically in relation to a hospital bill incurred for Barbara's hospitalization. An insurance company paid $1100 to the hospital which, according to Richard, should have been paid directly to him. The hospital paid the $1100 to Richard, although there remained $1500 owing on the hospital bill. The hospital sued Richard for the $1500. Richard's action seemed inconsistent with Richard's habit of paying bills scrupulously.

During the four months after Barbara's death, the evidence presents a picture of a warm and mutually helpful relationship between Richard and his children. He played cards with his son, Richard, Jr. He and the children drove to Minnesota on a gambling trip. The son who had been in prison was released and made his home with his father.

In October, Richard met Faith MacArthur at a Parents without Partners meeting. Faith was twice a widow, each of her two husbands having died. Richard was immediately attracted to her and began to court her favor. Their relationship rapidly ripened into romance. Richard began spending more and more time with Faith, and less with his children, grandchildren and other relatives whom he had regularly associated with. Sometime after Richard met Faith, he commenced a campaign to get his son, who had been living with him, out of his house. By January, 1992, this campaign was successful, and the son vacated the house.

Richard now took a new lease on life. His interest in the flea market business revived. He and Faith re-established a flea market business, whether on the same scale as his earlier business one cannot tell from the record. In January, Faith sold her house in Holts Summit and moved in with Richard, refurnishing his house, which was practically naked of furniture, with her own household goods.

Richard's relationship with his children deteriorated. They took him to task about his relationship with Faith. Richard was irritated by their resistance to his relationship with Faith, and responded angrily to their remonstrations. Richard from time to time wanted returned to him some of the money he had given to his children after the September auction. One son, Richard, Jr., returned to him in a lump sum the entire $5,000 his father had given him. The others were less forthcoming. Sue reminded her father that money had to be reserved for his funeral expenses. She remonstrated with her father and Faith over their extravagance, pointing out to them that Richard received only $780 per month in social security, and that Faith made only $5 per hour from her two-days-per-week employment. Later, Richard demanded that Sue apologize to Faith about her comment that Faith made $5.00 per hour. More and more, as time passed, he withdrew from his children and grandchildren, although the family had always been a close-knit family.

Friends and family members testified that Richard was normally friendly and good-humored, but that he became increasingly "argumentative" with people. The testimony does not relate this change to the date of the will, April 29, 1992. It could be supposed to have been a continuing condition, with the auction-stopping incident its first manifestation.

The children theorize that Richard was under Faith's domination. One thing that is developed in the evidence is Richard's obsession with sex. This showed up four days after Barbara's death. Richard proposed a sexual liaison between himself and his sister-in-law, or so the sister-in-law understood it. He talked about intimate sexual matters with his children, apparently without inhibition. This was out of character for Richard; he had always been reticent about such matters. In his relationship with Faith, he was tormented by a sexual dysfunction which prevented sexual satisfaction, although he sought and received medical help. One witness, who rented flea market stalls to Richard and Faith, testified to Faith's ordering Richard about in a peremptory manner, and to his docile submission. At one time, Richard lamented to him that he could do nothing to please Faith. When the friend asked Richard why he didn't kick her out, Richard said she would have no place to go.

Sue said her father came to her house crying because Faith "was threatening to leave him all the time, and he said it was our fault."

On January 22, 1992, Richard made a will. This was during the month Faith moved into his house. The January will gave Faith all the personal property located within his residence and all the assets of his antique business, and gave her the right to occupy his house for one year after his death. The balance of his estate he left to his eldest son, Richard, Jr. The other three children he left $1.00 each.

On April 29, 1992, he made the present will, by which he left all his estate to Faith, if she survived him, and named her as his personal representative. This will was in effect at the time of his death, and is the will which is being contested here.

The children were not informed about the January or the April will.

Richard died on October 24, 1992, after a very brief final episode of illness. He was 62.

We remind ourselves that neither judge nor jury may make a will for the decedent. If he had the mental capacity to make a will, and if he made it of his own volition, so that it may be said to be his will and not that of another, then it is not our place to pass judgment on his motives or his wisdom in making the will he made, nor to substitute our own judgment for his. One has the right to do as he pleases with what is his.

■ We are unable to find in this record any evidence that Faith MacArthur exercised any undue influence upon the decedent to get him to make this will in her favor. Undue influence is "such influence as amounts to force, coercion, or overpersuasion, which destroys the free agency and will power of the testator." *Wilhoit v. Fite*, 341 S.W.2d 806, 813 (Mo.1960); *see also Morse v. Volz*, 808 S.W.2d 424, 432 (Mo.App.W.D.1991); 5 Francis M. Hanna and John A. Borron, Jr., *Missouri Practice: Probate Law and Practice* § 122 (2d ed. 1988). Motive and opportunity alone are not enough to establish undue influence. *Sweeney v. Eaton*, 486 S.W.2d 453, 456 (Mo.1972).

■ The three elements necessary to create a presumption of undue influence are: (1) a fiduciary relationship between the beneficiary and the testator; (2) the existence of a substantial benefit to the fiduciary; and (3) activity by which the beneficiary caused or assisted in causing the execution of the will. *Morse*, 808 S.W.2d at 432; *Jones v. Walker*, 774 S.W.2d 532, 534 (Mo.App.W.D.1989); *Dobbins v. Hupp*, 562 S.W.2d 736, 740 (Mo. App.W.D.1978). Once these three elements have been established and a presumption is created, a claim is properly submissible to the jury. *Dobbins*, 562 S.W.2d at 740.

■ There is no evidence of any activity on Faith's part to bring about the making either of the January or the April will. The only testimony about the actual making of the wills is the testimony of Richard Hague, Sr.'s, attorney. The attorney had been well acquainted with the testator for a considerable time; she was at the same time representing him in a workers' compensation claim. She testified to the testator's resoluteness in both will changes, *i.e.*, in the January will and the April will. Faith was not involved in the contacts with the attorney.

We hold, therefore, there was no evidence of undue influence which would invalidate decedent's will, and the submission and the verdict on that ground is unsupported by the evidence.

■ Is there evidence of decedent's lack of testamentary capacity? In order to have testamentary capacity at the time a will is executed, the testator must: (1) understand the ordinary affairs of his life; (2) understand the nature and extent of his property; (3) know the persons who were the natural objects of the bounty; and (4) intelligently weigh and appreciate his natural obligations to those persons and know that he is giving his property to the persons mentioned in his will. *Morse*, 808 S.W.2d at 430.

■ No particular degree of mentality is required as long as the testator can adequately consider the requisite features. 5 Hanna & Borron, *supra*, § 96.

Taking the evidence and the inferences therefrom which is most favorable to the verdict, and disregarding that which is contrary to the verdict, we find the evidence falls far short of establishing testamentary incapacity on the part of Richard Hague, Jr.

■ At the time of making the April will—until a few days before his death in October of 1992—decedent was attending to the ordinary affairs of life and was in full control of his faculties; there is no ground in the evidence for any notion that he did not have a good grasp on his property; there is no ground in the evidence for a belief he did not know and understand who were the "natural objects of his bounty," and no evidence that he did not evaluate the claims of his children and of Faith. Another person than he might have placed a different assessment on the relative claims of the children and Faith. But Richard made his judgment by his own lights, and it was his to make.

Two cases present parallels to the present case, and support our holding. Those cases are: *Lewis v. McCullough,* 413 S.W.2d 499 (Mo.1967), and *Morse v. Volz,* 808 S.W.2d 424 (Mo.App.W.D.1991).

We have considered the defendant's evidence, looking for evidence which would support the verdict. Plaintiffs would be entitled to the benefit of any of defendants' evidence which aided their case. *See Ladish v. Gordon,* 879 S.W.2d 623, 627 (Mo.App.W.D.1994); *Powell v. Hickman,* 793 S.W.2d 885, 809 (Mo.App.W.D.1990). Defendant's evidence consists of the testimony of the physician who treated Richard during the relevant time; that of the lawyer who prepared the will and who represented Richard in his workers' compensation claim; and that of Faith herself. None of the evidence lends any support to the verdict, and in fact supports the hypothesis that Richard was intelligent, strong-minded and independent, until the time of his death, and that Faith had no role at all in the making of his April 29 will.

Judgment reversed and cause remanded with directions to enter judgment in favor of the defendant.

All concur.