**Ruby ALLEE, Scott Davidson, and Mary Jane Foster Scott, Appellants,**

v.

**RUBY SCOTT SIGEARS ESTATE, et al., Defendants,**

**William Scott, Personal Representative of the Estate of Ruby Scott Sigears and James J. Scott, Respondents.**

**No. WD 64980.**

Missouri Court of Appeals, Western District.

Jan. 31, 2006.

Frank H. Strong, Jr., Maryville, MO, for appellants.

Theodore M. Kranitz, St. Joseph, MO, for respondents.

Before HAROLD L. LOWENSTEIN, Presiding Judge, JOSEPH M. ELLIS, Judge and THOMAS H. NEWTON, Judge.

JOSEPH M. ELLIS, Judge.

Ruby A. Allee, Scott M. Davidson, and Mary Jane Foster ("Mary"; a/k/a Mary Jane Moyer), collectively referred to as "Appellants," appeal a final judgment of the Circuit Court of Nodaway County finding, in favor of James J. Scott ("Jim") and William S. Scott ("Bill") (collectively referred to as "Respondents"), that the last will and testament of Ruby Scott Sigears ("Ruby"; a/k/a Ruby D. Scott), which was executed on February 25, 2000, as well as the beneficiary and warranty deeds she executed on the same date, were all valid and enforceable expressions of her intent.

At the time she executed the documents in question, Ruby was eighty-one years old and had four living children from her first marriage—two daughters (Joan Davidson

("Joan") and Mary)[1] and two sons (Jim and Bill). On February 25, 2000, Ruby executed a five-page will, two deeds (a beneficiary deed and a warranty deed), and a durable power of attorney, all of which were drafted by attorney Jeannie Trimmer ("Attorney Trimmer").

On May 9, 2000, the daughters filed a petition seeking the appointment of a guardian and conservator for their mother. Jim's wife, Jacqueline Scott ("Jackie"), filed a competing petition on May 23, 2000. After conducting what turned out to be a non-adversarial hearing, the court found Ruby to be fully incapacitated and disabled and appointed the Public Administrator of Nodaway County as the guardian of Ruby's person and the conservator of her estate on June 14, 2000.

Ruby died on January 11, 2003. On March 5, 2003, the daughters presented a different, earlier will as Ruby's last will and testament, which was not admitted to probate.[2] Instead, the February 25, 2000 will offered by Respondents was admitted. On April 22, 2003, the daughters filed a Petition to Contest Purported Will in which they averred that Ruby was not of sound mind and lacked sufficient mental capacity at the time she executed the will of February 25, 2000, and that the will was procured by the undue influence of Respondents. On May 27, 2003, the daughters also filed a Petition to Set Aside Deeds in which they averred that Ruby was not of sound mind and lacked sufficient mental capacity at the time she executed the deeds, and that the deeds were procured by the undue influence of Respondents. The trial court subsequently consolidated the actions. Joan died on March 9, 2004, after which her children (Ruby A. Allee and Scott M. Davidson) were substituted as parties.

The case was tried to the court on November 12, 2004. At trial, the court was presented with a variety of conflicting evidence on the issues of mental capacity and undue influence. On November 18, 2004, the court entered a judgment in favor of Respondents on Appellants' claims of undue influence and lack of mental capacity, finding that Ruby's February 25, 2000 will "was and is her own Last Will and Testament," and that the beneficiary and warranty deeds she also executed on the same date "were and are expressions of her intention and are declared valid and subsisting, and shall be carried out according to their expressed intent." On December 17, 2004, Appellants filed a Motion to Set Aside the Judgment and Grant a New Trial or To Reopen the Judgment for Additional Evidence, Amend or Make New Findings of Fact, and to Direct the Entry of a New Judgment, which was overruled on January 7, 2005. As authorized by sections 473.083.7, 512.020, and 472.160.1(14),[3] Appellants then filed a timely notice of appeal.

As in any court-tried civil case, we apply the standard of review set forth in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976).

> [T]he decree or judgment of the trial court will be sustained by the appellate court unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it

---

1. A third daughter, Kathleen Steinhauser, had predeceased Ruby in August 1994.

2. Appellants offered this will, which their counsel claimed was executed on June 25, 1992, into evidence during trial of this matter, but the court sustained Respondents' objection thereto. Appellants do not assign this ruling as error on appeal, and did not present any other evidence (or an offer of proof) as to the prior will's contents at trial.

3. All statutory references are to RSMo 2000.

erroneously declares the law, or unless it erroneously applies the law. Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is "against the weight of the evidence" with caution and with a firm belief that the decree or judgment is wrong.

*Murphy*, 536 S.W.2d at 32. "Great deference must be given to the trial court's resolution of conflicts in evidence," *Hugenel v. Estate of Keller*, 867 S.W.2d 298, 302 (Mo.App. S.D.1993), and we give due regard to the court's opportunity to have judged the credibility of the witnesses before it. *Tuchschmidt v. Tuchschmidt*, 861 S.W.2d 741, 743 (Mo.App. E.D.1993). "Accordingly, the statement of facts which follows treats the evidence in a light most favorable to the judgment of the trial court and defers to the judgment of the trial court on matters in which the evidence is in conflict." *Kennedy v. Jasper*, 928 S.W.2d 395, 397 (Mo.App. E.D.1996).

Ruby's initial consultation with Attorney Trimmer, which occurred sometime prior to February 25, 2000, lasted two or three hours. During this meeting, which was also attended by Respondents at Ruby's request, Attorney Trimmer had an extensive discussion with Ruby concerning how she wanted her will and general estate plan to be handled. Attorney Trimmer testified that in her experience, it was common for adult children to come in with elderly clients in need of estate planning services, and that she had met with Ruby "[l]ong enough to know if there was a problem."

The disputed documents were executed at Attorney Trimmer's law office on February 25, 2000. Jim and Bill testified that on both visits to see Attorney Trimmer, Ruby had driven herself to and from Attorney Trimmer's offices in her own automobile, and that she had done so alone. Ruby, Attorney Trimmer and her secretary Stephanie Williams, Jim and his wife Jackie, and witness Kermit Goslee were all present when the documents were executed. At Attorney Trimmer's suggestion, Jim videotaped these proceedings,[4] and the VHS tape was admitted into evidence and viewed both during the hearing and by the trial court in chambers.

As relevant here, the will, which was properly notarized and attested, provided that "[a]ll real and personal property which I shall own at my death shall be divided equally between my two sons: William Scott and James Scott, with each son to receive an undivided one-half (1/2) interest which is to be held as tenants in common." The will further stated: "I intentionally make no provision in this my Last Will and Testament for my daughters, Joan Davidson and Mary Jane Moyer, having already given large amounts of money to them during my lifetime and having been poorly treated by them. Note that my daughter, Kathleen Steinhauser, has predeceased me." The deeds executed by Ruby granted Respondents half ownership interests in certain Missouri real estate owned by her, and the durable power of attorney appointed Jackie as Ruby's attorney in fact. Ruby paid Attorney Trimmer's fee for the legal work she had performed for her, and told Mary about the will the same day it was executed.

Attorney Trimmer testified that she saw no "red flags" indicating the possible presence of undue influence, and that it was Ruby, not Respondents, who directed her to insert the provision in the will that

---

**4.** Attorney Trimmer testified that she made this suggestion because "any time you have a client or someone that is drafting a will cut-ting one of the children out, there's always a concern that it will be contested."

omitted the daughters from receiving an inheritance. Based on her observations during the initial consultation and the actual execution of the documents, she felt Ruby was "very competent. I felt she knew what was going on. She knew how she wanted her estate divided. . . . I didn't feel she was under any pressure from the boys at all."

Jim testified that although he lived in Bedford, Iowa, he visited Ruby in Maryville, Missouri, two or three times a month and that on occasion, she had driven to Iowa to visit him. He testified that the discussions he had with Ruby over the five or six years preceding her execution of the will were perfectly understandable, and that she never appeared to be confused concerning what she was talking about. Following her quadruple bypass surgery in 1997, he saw some physical changes in Ruby but stated that it "didn't affect her mental capacity at all." Jim also stated that Ruby was appropriately dressed and very well groomed at all times, and that there was nothing about her behavior that made him feel uncomfortable or caused him to have any concerns.

Jim further testified that he was a social worker for the State of Iowa, and had a bachelor's degree in social science. He also has a master's degree in educational administration, with a concentration in counseling psychology, and was six credit hours short of obtaining a master's degree in counseling psychology. He explained that he was qualified by the State of Iowa to perform investigations of elder abuse, during which he had determined the competency of elderly people. His professional opinion, based on his experience, training, and personal observations, was that Ruby was competent on February 25, 2000. Jim further stated that the terms of the will were what his mother wanted, and acknowledged that although he was invited by Ruby at some point to give his input on the will, he declined, saying, "Mother, leave it to whom you want to."

As to Ruby's relationship with Mary, Jim testified that last time he saw Ruby and Mary together, Ruby stepped in between Mary and Jackie to prevent Mary from verbally abusing and physically assaulting Jackie, after which Ruby asked Mary to leave Ruby's home.

Although Ruby had allowed Mary and her children to live in Ruby's Maryville, Missouri home since approximately 1989, Mary acknowledged having received a certified letter from Jackie's lawyer Zel Fischer on April 5, 2000, which was admitted into evidence and stated that "Mrs. Ruby Scott has requested that you move from her property[.]" The letter gave Mary thirty days to move out, but she did not do so until June 30, 2000.

Bill's wife, Debbie Scott, testified that she first met Ruby in 1995 or 1996 and that she had been to Maryville a handful of times (possibly five times) prior to February 25, 2000. She further testified that in 1995 and 1996, she had telephone conversations with Ruby during which Ruby told her she thought her daughter Mary was writing checks on her checking account in amounts of six to seven hundred dollars and that Mary and her children were "tearing up her house and yard" and that there was "[j]unk all over the yard." One of these checks was used to purchase a dog pen, although Ruby had no animals in her home other than a small dog. She also indicated that Ruby related to her that Ruby's relationship with Mary was "kind of going sour" to the point of "getting physical," relating an altercation where Mary had pulled Ruby's hair and twisted her arm. Ruby also told her that she was "very unhappy" in her home and "very much wanted her daughter and grandchildren to move out." Debbie Scott

further testified that prior to June 2000, while Ruby was a resident at the Nodaway Nursing Home and Debbie and Bill were in an interior hallway, she "could hear somebody hollering, 'You're not going home. You're gonna stay here your ten days.' I was really shocked to find that it was [Mary] that was hollering at [Ruby]."

Jim acknowledged that he was present in court in June 2000, when a guardian and conservator were appointed for Ruby. He testified that although he had stipulated that Ruby was in need of a guardian and conservator at that point, he had only done so on the advice of his attorney, who advised him to so stipulate to avoid having the family's "dirty laundry" aired in public, and since the guardian could then "go after anyone who [had] committed criminal acts against her."

Bill testified that Ruby did not ask him what to put in the disputed will or deeds. He said that when she had asked him in the past about such matters due to some "bad feelings" she had about certain members of the family, he "[t]old her to do with the damn stuff what she wanted to." Other than that, Bill never told Ruby how she should dispose of her estate or what she ought to do with any part of her real or personal property. He further testified that although Ruby's estate had at one time been quite considerable, "it had dwindled down over the previous years." To illustrate this, he testified that on December 10, 1998, Ruby had sold, at public auction, 120 acres of Holt County real estate at $1,500 an acre. Nevertheless, the resulting $180,000 in sale proceeds, which she received in 1999, were no longer part of Ruby's estate at the time of her death four years later.

While Ruby was still alive, Greg Wennihan had farmed Ruby's arable land under a three-year lease. He testified that Ruby died during the third year of the lease, and

that during those three years, he had never noticed anything untoward or unusual about her behavior when he talked with her about his ongoing farming operations and delivered monthly rent payments to her in person at her home. He also testified that when he would visit Ruby at her home, she was always clean, pleasant, and appropriately dressed, and that she never said or did anything indicating to him that "she didn't know what was going on."

Ruby's treating physician, Kanti Havaldar, M.D., testified that she was his patient from 1985 until her death in 2003. In 1987, Dr. Havaldar diagnosed Ruby with cerebral vascular insufficiency and referred her to a neurologist, who determined that of her four carotid arteries, one was 100 percent occluded and another was 50 percent blocked. In May 1997, Ruby had a heart attack and her cardiologist performed a catheterization, as well as a quadruple bypass. By late 1999, testified Dr. Havaldar, Ruby also began suffering from vascular dementia. However, Dr. Havaldar indicated that it was not until several months after the events of February 25, 2000, that her "rapid deterioration started."

Asked whether, at the time Ruby executed the disputed will and deeds on February 25, 2000, she would have been able to: (1) understand the ordinary affairs of life; (2) understand the nature and extent of her property; (3) know the persons who were the natural objects of her bounty; and (4) intelligently weigh and appreciate her natural obligations to those persons, Dr. Havaldar replied: "First three answers is yes. The last answer is no."

■ At the close of all the evidence, the court took a recess. Later that day, the court made the following comments on the record in the presence of counsel for both

sides.[5] As to undue influence, the court stated:

Across the board, undue influence—there has not been evidence of that proven in here. It's a sad state that there's such animosity in the family, but I don't believe that undue influence has been proven. There [were] some things that were not good practices. [It] looks like at the start of the tape [that Jackie] was the one that went over the will with [Ruby]. But—and I realize that changes the burden. But I don't think even though having a relation in a fiduciary capacity ratchets up what has to be proven, or used to defend, I guess is more accurate. I just don't think that's been proven. I can't find undue influence in here.

As to testamentary capacity, the court stated:

As far as the case as a whole, up until Dr. Havaldar's testimony I was not hearing anything that caused me to believe that the will should be kicked.... The other issue it comes down to is mental competency. Dr. Havaldar's testimony was quite strong on the issues that need to be proven on will contests. Able to understand the ordinary affairs of life. Able to understand the nature and extent of the property and able to know the persons who were the natural objects of the bounty. He said she should be in good shape on those. And from the testimony I heard and reviewing the tape, I concur with that, she was

aware of those items. Dr. Havaldar said based on her health condition he didn't believe she was in a position to knowingly weigh and appreciate the natural obligations to those persons. Now his testimony that he kept saying was, 'know how to do right.' It's not the same thing.

I viewed the tape. Also listened to what Jeannie Trimmer testified to. She spent two to three hours with [Ruby] and she didn't feel there was any problem. I think a careful lawyer—you have to give credence to what they say. Quite honestly, using my own good judgment sitting here, ... as to the last, 'appreciate the natural obligations to those persons'—as far as Mary Scott was concerned, [Ruby] was quite clear in that, that she had housed Mary and her family for a lot of years and it seemed to me as though she was saying that that is what she had [already] given her of her estate. And I read that to take it that [Ruby] felt she owed [Mary] nothing under that. Whether that is right or not, it sure tells me that she thought through this issue and made a decision on that.... We're not here to double guess as far as right, you know, what we think by using our value standards, how an estate should be divided up. It's looking at the law.

Six days later (November 18, 2004), the trial court entered its formal judgment, which states, in relevant part:

---

**5.** Neither Appellants nor Respondents requested that the court issue conclusions of law or specific findings on the various controverted fact issues presented by the case. In their brief, Respondents suggest that, because this is so, we should assume that the trial court made all factual findings consistent with its judgment. It is true that we generally "assume, in the absence of a specific finding, that all fact issues were resolved in accordance with the circuit court's judgment."

*Young v. Young,* 14 S.W.3d 261, 263 (Mo.App. W.D.2000). "Nonetheless, when a circuit court volunteers findings of fact, the findings are reviewable on appeal. The voluntary statement by the circuit court of the grounds for its decision certainly may be considered in determining what evidence, if any, it rejected. It may also be considered in determining whether the circuit court misapplied the law." *Id.* (internal citations, quotation marks, and brackets omitted).

1. The evidence in the two cases before the Court, # # CV703–87CC (will contest) and CV703–108CC (action to set aside deeds) depend upon identical facts and law, and are ruled together.

2. Decedent Ruby Scott Sigears was of sound and disposing mind and memory when she executed her last will and testament of 25 February 2000, in that:

(a) She was able to understand the ordinary affairs of life, and

(b) She was able to understand the nature and extent of her property, and

(c) She was able to know the persons who were the natural objects of her bounty, and

(d) She could intelligently weigh and appreciate her natural obligations to those persons.

IT IS THEREFORE the JUDGMENT of the Court that the Last Will and Testament of Ruby Scott Sigears dated 25 February 2000 was and is her own Last Will and Testament; and that the beneficiary deed and warranty deed executed by the decedent also on 25 February 2000 were and are expressions of her intention and are declared valid and subsisting, and shall be carried out according to their expressed intent. Judgment for defendants accordingly.

We now proceed to consider Appellants' four points on appeal, which we will address out of their original order. In their fourth point, Appellants argue that "[t]he court erred in not finding undue influence because such a finding is against the weight of [the] evidence in that substantial testimony and evidence established facts from which undue influence may be inferred."

■ "Undue influence means such influence as destroys the free choice of the person making the will. To break the will the evidence must show such influence as amounts to force, coercion or overpersuasion sufficient to destroy the free agency and will power of the testator." *Morse v. Volz*, 808 S.W.2d 424, 432 (Mo.App. W.D. 1991) (internal citation omitted).

Factors considered in determining the existence of undue influence in the making of a will include: (1) an unnatural disposition, (2) an onset of solicitude of the [testator] by the proponent, (3) a change in predetermined testamentary intent, (4) unusual circumstances surrounding the execution of the will, (5) hostile feelings of the beneficiary toward the expected recipients, (6) remarks of the beneficiary to the [testator] derogatory of contestants, (7) the source of the [testator's] property being such as to make the disposition to the beneficiary unlikely, and (8) recitals of the will itself indicates undue influence.

*Ruestman v. Ruestman*, 111 S.W.3d 464, 479 (Mo.App. S.D.2003) (citation omitted). "The burden is on the plaintiff to prove undue influence." *Id.* at 478.

■ Although Appellants would have us do so, we need not painstakingly recount the evidence presented by both sides as to each of these factors, much of which has already been set forth in the factual summary *supra*. It is enough to say that a complete answer to Appellants' contention in this point is found in *Ryterski v. Wilson*, 740 S.W.2d 374, 376 (Mo.App. S.D.1987), in which appellant children sought review of a decision of the court which denied their request that the court set aside certain deeds because of undue influence on the part of respondent grantees:

Appellants contend in their remaining point that the trial court erred because its judgment was "against the weight of the evidence in that the evidence shows that the deeds in question were obtained by undue influence on the part of the respondents". To set aside a deed on

the basis of undue influence, there must be clear, cogent and convincing evidence of such influence. *Estate of Stanley*, 655 S.W.2d 88, 91 (Mo.App. W.D. 1983).... As the evidence of undue influence was in dispute, we ordinarily defer to the finding of the trial court. This court should exercise the power to set aside a judgment on the ground that it is against the weight of the evidence with caution and only when we have "a firm belief that the decree or judgment is wrong." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). Upon reviewing the evidence here we have no such belief. This point is denied.

Likewise, in light of the relevant supporting facts recited *supra*, and after carefully reviewing the entire record, including the conflicting evidence relied on by Appellants, we do not firmly believe that the trial court's judgment finding no undue influence by Respondents or their wives as to either the will or the deeds is wrong. Point denied.

 In their second point, Appellants contend that "[t]he court erred in finding testamentary capacity because such a finding is against the weight of [the] evidence in that probative testimony and evidence by the testator's physician found the testator to be in no better [condition] at the time of execution than when declared incompetent and that by observation over a number of months denied the testator had capacity to intelligently weigh and appreciate her obligations toward the natural objects of her bounty."

The proponent of a will has the burden of proof concerning testamentary capacity of the testator. Once the proponent makes a prima facie case showing due execution and attestation of the will as provided by statute and that the decedent was of sound and disposing mind when the will was signed, the contestants must then produce substantial evidence to overthrow the prima facie case and to prove that the testator lacked sufficient mental capacity. The burden of proof, however, remains with the proponent of the will throughout the case. *Hugenel*, 867 S.W.2d at 304–05 (internal citations omitted).

In order to have testamentary capacity at the time a will is executed, the testator must: (1) understand the ordinary affairs of his life; (2) understand the nature and extent of his property; (3) know the persons who were the natural objects of the bounty; and (4) intelligently weigh and appreciate his natural obligations to those persons and know that he is giving his property to the persons mentioned in his will. No particular degree of mentality is required as long as the testator can adequately consider the requisite features. *In re Estate of Hague*, 894 S.W.2d 684, 688 (Mo.App. W.D.1995) (internal citation and original paragraph style omitted). "Such capacity must exist at the time the will is executed. The right to dispose of property by will as the testator may choose is one that the law does not readily deny on the ground of lack of testamentary capacity." *Morse*, 808 S.W.2d at 430 (internal citation and original paragraph style omitted).

Appellants do not deny that Respondents made their prima facie case, but argue that they overcame it with their evidence. The trial court's gratuitous findings on this issue, all of which are supported by substantial record evidence, clearly demonstrate that while the court credited Dr. Havaldar's testimony that, at the time Ruby executed the disputed will on February 25, 2000, she was able to understand the ordinary affairs of life, understand the nature and extent of her property, and know the persons who were the natural objects of her bounty, it reject-

ed his conclusion that she was unable to intelligently weigh and appreciate her natural obligations to those persons, choosing instead to accept the contrary evidence it had heard and seen bearing on that issue. *See Kennedy,* 928 S.W.2d at 397 ("The trial court, when sitting as the trier of fact, may believe all, part or none of the testimony of any witness.") This contrary evidence included the testimony of Attorney Trimmer (which the court expressly found to be credible), the videotape made at the time Ruby executed the will in question, and the testimony establishing that Ruby had taken her adult daughter Mary and Mary's children into Ruby's own home for over ten years, which permitted the reasonable inference that she intelligently took that into consideration in deciding that she had already done enough for Mary during her lifetime and had no moral or natural obligation to do more. While others might have placed a different assessment on the relative claims of the daughters and the sons, the decision was Ruby's to make as she pleased. *See Estate of Hague,* 894 S.W.2d at 688.

Furthermore, in light of the other relevant supporting facts recited *supra,* and after carefully reviewing the entire record, including the conflicting evidence relied on by Appellants, we do not have a firm belief that the trial court's conclusion that Ruby was of sound and disposing mind and memory when she executed her last will and testament on February 25, 2000 is wrong. Point denied.

■ In their first point, Appellants claim the court erred in failing to apply a presumption of testamentary incapacity in favor of Appellants "because probative evidence indicated that the testator was in no better condition on the date of execution than when in slightly more than three months the testator was without objection adjudged to be incapacitated and disabled, in need of a guardian and conservator, and presumed incompetent." They further claim that the court erroneously "declined to apply the standard of presumption set out by a finding of an individual as fully incapacitated and in need of a guardian and conservator." We disagree.

Appellants rely upon section 475.078.3 for such a presumption. In relevant part, section 475.078.3 states: "A person who has been adjudicated incapacitated or disabled or both shall be presumed to be incompetent." While Ruby was indeed so adjudicated on June 14, 2000, no valid statutory presumption of mental incapacity arose in the case *sub judice* because she executed the disputed will on February 25, 2000, which was slightly more than three months *before* that adjudication took place. In other words, the fact that Ruby was adjudicated to be fully incapacitated and disabled on June 14, 2000, does not give rise to a presumption that she was mentally incapable of validly executing a will more than three months earlier. *See Schuler v. Schuler,* 290 S.W.2d 192, 195 (Mo.App. E.D.1956). This is especially true here, since there was evidence that although Ruby had begun suffering from vascular dementia in late 1999, it was not until several months after the events of February 25, 2000, that her "rapid deterioration started." Point denied.

In their third and final point, Appellants assert that the court erred in failing to apply a presumption of undue influence against Respondents because "probative evidence indicated a fiduciary relationship by granting [a] power of attorney to a son's wife, substantial benefit to the fiduciary in that the sons [became] sole beneficiaries, and the beneficiaries assisted in causing the execution of the will and deeds." Once again, we disagree.

■ "A presumption of undue influence arises ... when the evidence shows:

(1) a fiduciary relationship existed between the testator and the beneficiary, (2) the beneficiary received a substantial bequest in the will, and (3) the beneficiary was active in procuring the execution of the will." *Vancil v. Carpenter*, 935 S.W.2d 42, 44 (Mo.App. W.D.1996). "Once the plaintiff has established a confidential relationship and benefaction to the fiduciary, the courts take a very liberal attitude toward the quantum of proof necessary to establish that the fiduciary was actively concerned in some way which caused or contributed to the execution of the will." *Id.* at 45. "The presence of the fiduciary at the execution of the will and the exertion of his influence at the exact moment of execution need not be shown," *Dobbins v. Hupp*, 562 S.W.2d 736, 741 (Mo.App. W.D. 1978), and "[t]he existence of a power of attorney is significant evidence that a confidential relationship has developed." *Vancil*, 935 S.W.2d at 45.

Appellants assert that the court "accepted that a fiduciary capacity was present" but erroneously "declined to consider ... [the] presumption of undue influence." This assertion is refuted by the record, however, because the trial court's gratuitous findings on this issue clearly reflect that it was not only fully cognizant of the presumption, but was also concerned about the role a fiduciary (namely Jackie, who became Ruby's attorney in fact pursuant to a durable power of attorney executed by Ruby at around the same time the will was executed) had played in going over the will with Ruby. As the court put it: "There [were] some things that were not good practices. [It] looks like at the start of the tape [that Jackie] was the one that went over the will with [Ruby]. But—and I realize that changes the burden." Nevertheless, the court went on to find that Appellants had failed to prove the existence of undue influence to its satisfaction: "But I don't think even though having a relation in a fiduciary capacity ratchets up what has to be proven, or used to defend, I guess is more accurate. I just don't think that's been proven. I can't find undue influence in here." In light of the substantial evidence presented by Respondents tending to show that neither Jackie, her husband Jim, nor Jim's brother Bill had exercised undue influence over Ruby amounting to "force, coercion or overpersuasion sufficient to destroy [her] free agency and will power," *Morse*, 808 S.W.2d at 432, the trial court was forced to make a judgment call on conflicting evidence, to which we give "[g]reat deference," *Hugenel*, 867 S.W.2d at 302, in recognition of its "superior ability to judge factors such as credibility, sincerity, character of the witnesses, and other intangibles not revealed in the transcript." *Hoberock v. Hoberock*, 164 S.W.3d 26, 30 (Mo.App. E.D.2005). Point denied.

The judgment of the trial court is affirmed.

All concur.