In the Matter of: **GENE WILD REVOCABLE TRUST.**

**Cottey College, Respondent/Cross-Appellant,**

v.

**The School of the Ozarks, Inc., d/b/a College of the Ozarks, et al., Appellants/Cross-Respondents.**

Nos. SD 29430, SD 29684.

Missouri Court of Appeals, Southern District, Division One.

Dec. 9, 2009.

---

1. All further statutory references are to RSMo 2000 unless otherwise indicated.

Virginia L. Fry, Evelyn Gwin Mangan & David L. Schenberg, Husch, Blackwell, Sanders, L.L.P., Springfield, for Appellant.

Todd W. Ruskamp and Clayton T. Norkey, Shook, Hardy & Bacon, L.L.P., Kansas City, for Respondent.

ROBERT S. BARNEY, Judge.

This matter involves consolidated appeals by Appellant/Cross–Respondent The School of the Ozarks, d/b/a College of the Ozarks ("C of O") and Respondent/Cross–Appellant Cottey College ("Cottey").[1] In short, C of O challenges the Probate Division's ("the probate court") finding that two trust instruments properly amended a trust created by Shirley Gene Wild ("Grantor"), and that Grantor had the requisite "mental" or "testamentary" capacity to validly execute the aforementioned amendments. C of O also challenges the probate court's denial of its motion for summary judgment seeking to reform a charitable remainder annuity trust ("CRAT") created in one of Grantor's trust instruments. Cottey's cross-appeal challenges the probate court's award of attorney's fees and costs and its determination of the payment source of these costs and attorney's fees awarded. We affirm.

As best we discern the record, Grantor created the The Gene Wild Revocable Trust (generally "the Trust") on July 10, 1990.[2] The fourteen-page Trust provided, in part pertinent to our review, that after payment of taxes and administration expenses, five percent of the residue of the Trust was to be distributed outright to Abou Ben Adhem Temple, and the balance was to be divided equally between two

---

1. James H. Wild ("Brother") was a named defendant in the underlying lawsuit as the successor trustee of the trust in question, however, he does not appear in this appeal. The following parties were also defendants in the underlying lawsuit: Virginia Cunningham ("Ms. Cunningham"), Tobias Andre Mills, Alexis Kenzie Mills, and Amber Fawn Mills. These parties also do not appear in this appeal.

2. The record is replete with details of Grantor's full and successful life as a businesswoman as well as her generous community activities. During her lifetime, Grantor, who was never married and lived the majority of her life with Brother in the home in which they were raised, ran the business office of her family's flourishing flower company until it was sold in the 1990's.

CRATs. The beneficiaries of these CRATs were Missouri Southern Foundation ("MSF") and C of O.[3] Grantor named herself as "Trustee" and Brother was named as "Successor Trustee" although Grantor had not discussed the details of her property disposition with Brother.

On October 7, 1991, Grantor amended the Trust ("the First Amendment") with a two-page amendment. The First Amendment, *inter alia*, removed the Abou Ben Adhem Temple as a beneficiary of the Trust thereby augmenting the shares of the two CRATs. Thereafter, on September 24, 1996, Grantor again amended the Trust ("the Second Amendment"). The two-page Second Amendment added "Disclaimer Rights" to be granted to any beneficiary or to Grantor and referenced a change in the name of her family's company. On August 20, 1997, Grantor amended the Trust for the third time ("the Third Amendment"). The three-page Third Amendment specified that the CRAT funds allocated to MSF were to be used "for the exclusive benefit of the Missouri Southern State College School of Business" and also set out that any references in the Trust to School of the Ozarks should be considered a reference to C of O. Then on May 6, 1998, Grantor amended the trust for a fourth time ("the Fourth Amendment"). The three-page Fourth Amendment deleted MSF as the beneficiary of one of the CRATs and inserted C of O as the beneficiary of both CRATs.

In August of 2002, Grantor met with a different attorney than the one who had previously prepared her estate planning documents. After correspondence and several meetings, on November 21, 2002,

Grantor executed the "Restated Revocable Trust Agreement of Shirley Gene Wild . . ." (the "Restated Trust"). The sixteen-page Restated Trust referenced the original Trust as well as the four amendments and set out that Grantor "does desire to restate said Trust and all amendments thereto in order to create a Restated Revocable Trust Estate for the purposes and uses hereinafter set forth. . . ." The Restated Trust neither expressly revoked nor supplanted Grantor's prior Trust. It did, *inter alia*, remove Brother as Successor Trustee and created a small annuity for his benefit. The Restated Trust also created a single CRAT in favor of C of O and named Cottey a contingent remainder beneficiary.[4]

Grantor had a total right knee replacement on January 3, 2003, and a total left knee replacement on July 18, 2003. In 2004 she was diagnosed with cervical cancer and in July of that year she underwent extensive surgery in an effort to eradicate the cancer. Subsequent to the time of her knee replacement surgeries and throughout her cervical cancer treatment, numerous medical personnel and other lay witnesses noted Grantor showed signs of increasing forgetfulness and varying degrees of dementia.

In August of 2004, Grantor was discharged from the hospital following recuperation from her cervical cancer treatments and went to live at the Sarcoxie Nursing Center ("SNC") as Brother could no longer care for her at home due to the fact that she had colostomy and urostomy bags. Around this time, Brother contacted his own attorney at Grantor's urging and told him Grantor wanted to make

---

3. Grantor had been a longtime supporter of C of O where she often attended events and aided local students in getting admitted to C of O. Further, Grantor's great-aunt had been a professor there when Grantor was a child.

4. Grantor was a Cottey alumna and had supported the institution over the years with her volunteer efforts as well as significant financial donations.

some changes to the Trust. Brother conveyed her desired changes to the attorney and provided him with copies of the Trust and the four prior amendments.[5] The attorney then mailed Grantor a proposed copy of a fifth amendment to the Trust ("the Fifth Amendment"). On September 9, 2004, the attorney visited Grantor at SNC whereupon she executed this Fifth Amendment. Specifically referencing the Trust and the prior amendments, the Fifth Amendment appointed Grantor and Brother as Co–Trustees whereby "[e]ach trustee is vested with all rights, powers and duties of the [t]rustee and may act individually and without the remaining [t]rustee." This Fifth Amendment also provided for two equal CRATs: one to benefit Cottey and the other to benefit C of O.

The following month, on October 14, 2004, Grantor signed a sixth amendment to the Trust ("the Sixth Amendment"). This Sixth Amendment essentially made no substantive changes to the distribution of the Trust residue as it pertained to either C of O or Cottey but provided for changes to the distribution of certain tangible personal properties and real estate.

Grantor passed away on June 19, 2005.

On February 1, 2006, Cottey filed its "Petition" requesting declaratory relief and a determination as to whether the Fifth and Sixth Amendments were effective and enforceable contending it was entitled to share equally in the residue of the Trust with C of O. The following day C of O brought a declaratory judgment action against Cottey.[6] This latter action by C of O was treated by the probate court as a counterclaim to the petition filed by Cottey.

On August 1, 2007, C of O filed a "Motion for Summary Judgment" on Counts I and III of its own counterclaim. On September 7, 2007, Cottey filed its "Motion for Partial Summary Judgment" in which it asserted that it was entitled to a judgment as a matter of law on C of O's Count I.

In its order of October 15, 2007, the probate court granted Cottey's motion for partial summary judgment as to C of O's Count I and found that "[a]lthough the [Fifth Amendment] makes no reference to the [Restated Trust], the absence of such a reference does not negate the express intent of [Grantor] to ratify and then amend the prior version. . . ." The probate court determined the Fifth Amendment operated as a valid amendment to the Restated Trust. Likewise, the probate court determined the Sixth Amendment "effectively amended the terms of the Trust as they existed on the date of execution of that document, which were set forth in the Original Trust Agreement as amended by the First, Second, Third, Fourth, and Fifth Amendments." The probate court then denied C of O's motion for summary judgment relating to its own Count I and took the remainder of its motion, which was directed at its Count III, under advisement. The probate court ordered the parties to proceed to trial on C of O's Count

**5.** As he had no knowledge of its existence, Brother did not provide the attorney with a copy of the Restated Trust.

**6.** Ultimately C of O was permitted by the probate court to file its First Amended Petition which was also amended by interlineation, and denominated as "The School of the Ozark's, Inc.'s Counterclaim Against Cottey College." Count I sought a declaration that the Restated Trust revoked the prior Trust as well as the various amendments and that the Restated Trust was the operative document at the time of Grantor's death; Count II asserted Grantor lacked the requisite mental or testamentary capacity to direct the preparation of and execution of the Fifth and Sixth Amendments; and Count III sought reformation of the Restated Trust resulting from a drafting error in the creation of the CRAT.

II relating to Grantor's mental capacity to create any amendments to the Trust and set out that if C of O "is unsuccessful ... then Count III of their [c]ounterclaim is moot."

A three day trial was held in February of 2008 chiefly on Count II of C of O's counterclaim regarding its contention that Grantor lacked the requisite mental capacity to execute the Fifth and Sixth Amendments to the Trust. In its Findings and Judgment entered on September 16, 2008, the probate court, *inter alia,* determined Grantor had the necessary "mental" or "testamentary" capacity to execute the Fifth and Sixth Amendments to her Trust such that these amendments were to be enforced over any contrary provisions of the Restated Trust. The probate court further awarded "reasonable attorneys' fees and costs" to Cottey, Brother, the guardian ad litem for one of the potential beneficiaries, and Ms. Cunningham, a prior named successor trustee, out of the funds of the Trust prior to the funding and distribution of the CRATs in favor of Cottey and C of O.

On October 10, 2008, C of O filed a "Motion to Set Aside Judgment, Reconsideration and to Reopen Case for Additional Evidence," in which it asserted the Judgment entered by the probate court was not final because it failed to rule on a Motion to Dismiss previously filed by Brother; it did not dispose of C of O's request for attorney's fees; it did not award "a sum certain for attorney's fees for the parties to whom fees were awarded;" and it failed to dispose of C of O's Count III, which it had previously taken under advisement. This motion was overruled by the probate court on October 14, 2008. C of O then appealed the matter to this Court and this Court entered an order requesting a final

judgment be entered by the probate court. On February 25, 2009, the probate court entered its Amended Judgment in which, *inter alia,* it cleared up the deficiencies in the previously entered Judgment by specifically denying Brother's motion to dismiss; overruling C of O's motion for summary judgment on its Count III; awarding attorney's fees be paid to C of O and Cottey from the Trust prior to distribution of the CRATs; and overruling all remaining motions and claims. Both parties now appeal.

We shall address C of O's appeal first.

In its first point relied on, C of O asserts the probate court erred in granting Cottey's motion for partial summary judgment "because the Fifth and Sixth Amendments to the [Trust] were ineffective as a matter of law in that the [Trust] had been replaced by the unrevoked [Restated Trust]."

Appellate review of a summary judgment is based upon the record submitted below. *ITT Comm. Fin. Corp. v. Mid-America Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993). Here, the undisputed material facts were presented via cross-motions for summary judgment filed by Cottey and C of O. The probate court granted Cottey's motion for partial summary judgment. On appeal, we utilize a *de novo* standard of review and accord no deference to the decision below. *Poage v. State Farm Fire & Cas. Co.,* 203 S.W.3d 781, 783 (Mo.App.2006); *Bland v. IMCO Recycling, Inc.,* 122 S.W.3d 98, 102 (Mo.App.2003). Therefore, our task is to review the record and independently decide whether Cottey established there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. *Hitchcock v. New Prime, Inc.,* 202 S.W.3d 697, 699 (Mo.App.2006);

Rule 74.04(c)(6).[7] This Court uses the same criteria the probate court should have used in initially deciding whether to grant Cottey's motion. *Harris v. Smith,* 250 S.W.3d 804, 806 (Mo.App.2008). We view the record in the light most favorable to the party against whom judgment was entered, and the nonmoving party is accorded the benefit of all inferences which may reasonably be drawn from the record. *ITT,* 854 S.W.2d at 376.

Here, Cottey argued in its motion for partial summary judgment that the operative trust document at the time of Grantor's death was the Trust, including the Fifth and Sixth Amendments thereto, because the provisions of the Trust provided that it could be amended as Grantor desired. C of O argued to the contrary that the Fifth and Sixth Amendments were ineffective because they purported to amend the Trust, which was no longer a valid document due to the creation of the Restated Trust. We disagree with C of O's contention.

> It has long been held that 'to establish a valid express trust *inter vivos* there must be (1) a beneficiary, (2) a trustee, (3) a trust res so sufficiently described or capable of identification that title thereto can pass to the trustee, (4) actual delivery of the corpus, its character considered or a legal assignment of the same to the trustee actually conveying present title to the trustee; or the retention of title by the owner under circumstances which unequivocally disclose an intent to hold it for the use of another.'

*Webb v. St. Louis Cty. Nat. Bank,* 551 S.W.2d 869, 875 (Mo.App.1977) (quoting *Atlantic Nat. Bank v. St. Louis Union Trust Co.,* 357 Mo. 770, 211 S.W.2d 2, 5 (1948)) (emphasis added). "In interpreting provisions of a trust ... the words used are given 'their usual, ordinary and natural meaning unless there is something in the instrument to deflect from that meaning.' " *In re Thomas L. Harris Trust,* 204 S.W.3d 267, 271 (Mo.App.2006) (quoting *Lehr v. Collier,* 909 S.W.2d 717, 723 (Mo.App. 1995)). "In determining the meaning of a trust provision under Missouri law, the paramount rule of construction is that the intent of the person who created the trust is controlling, and that such intention must be ascertained primarily from the trust instrument as a whole." *In re Thomas L. Harris Trust,* 204 S.W.3d at 271; *see Hertel ex rel. Hertel v. Nationsbank N.A.,* 37 S.W.3d 408, 410 (Mo.App.2001). Accordingly, "[w]here instructions in a trust instrument are clear and unambiguous, the intent of the grantor at the time of the creation of the trust governs and subsequent modifications to the trust are effective only in the manner expressed in the trust instrument under a reserved power to amend." *In re Estate of Mueller,* 933 S.W.2d 903, 907 (Mo.App.1996); *see Love v. St. Louis Union Trust Co.,* 497 S.W.2d 154, 159 (Mo. banc 1973).

In 1990 when the Trust was created, Grantor provided in Article II of the instrument that "[d]uring [her] lifetime, Grantor specifically reserve[d] the right, at any time and from time to time, to revoke, alter and amend this Trust Agreement in whole or in part, and to add, substitute or withdraw property therefrom." There were no other provisions made within the Trust which specified the exact manner of amendment, revocation, or alteration or a limit to the number of times the Trust could be modified by Grantor. Further, no provision was made for notice to the successor trustee or any potential beneficiaries. Under these circumstances "where no method of exercise is specified,

---

**7.** All rule references are to Missouri Court Rules (2006).

alteration or partial revocation powers may be exercised in any manner sufficiently manifesting an intention to alter or to partially revoke." *Lipic v. Wheeler,* 362 Mo. 499, 242 S.W.2d 43, 46 (1951).

In our review of the amendments to the Trust, we observe that they all contained similar language and referenced the Trust's language regarding the reservation of the right to alter and amend the Trust as well as reiterating that the Trust provisions would remain in full force and effect save for the particular matter which was amended. For example, the First Amendment recited, in part, that Grantor "does hereby desire to amend, alter and change the Trust . . . dated July 10, 1992 . . ." and specifically "reserve[d] the right to alter and amend the Trust . . . and this amendment is made pursuant thereto." It also provided that in all other respects the Trust provisions "shall remain in full force and effect except as specifically amended herein." The Second Amendment, which was made in 1996, stated, in part, that Grantor "does hereby desire to amend, alter and change the Trust . . . dated July 10, 1992 . . ." and she specifically "reserve[d] the right to alter and amend the Trust . . . and this amendment is made pursuant thereto." It also provided that "the original trust agreement dated July 10, 1990, shall in all other respects remain in full force and effect except as specifically amended herein." The Third Amendment, in part, referenced both the First Amendment and the Second Amendment and noted Grantor had "reserved the right to revoke, alter and amend the Trust Agreement, in whole or in part" such that she was exercising that right by "further revok[ing], alter[ing] and amend[ing] . . ." the Trust. Additionally it provided that "[e]xcept as herein revoked, altered and amended, the Trust . . . dated July 10, 1990, as amended October 7, 1991, and September 24, 1996, . . . is hereby ratified,

approved and confirmed." Likewise, the Fourth Amendment, in part, referenced the three prior amendments; noted Grantor's reservation of the "right to revoke, alter and amend the Trust . . . in whole or in part.;" and set out her desire to exercise that right by again amending the Trust. The Fourth Amendment also set out that "[e]xcept as herein revoked, altered and amended, the Trust . . . dated July 10, 1990, as amended October 7, 1991, September 24, 1996, and August 20, 1997, . . . is hereby ratified, approved and confirmed."

The Restated Trust, which was created in November of 2002, acknowledged Grantor "made a self-declaration of Trust dated July 10, 1990 . . .;" that "such Trust has been amended four (4) times with the Fourth Amendment being dated May 6, 1998 . . .;" and that Grantor "does desire to restate said Trust and all amendments thereto in order to create a Restated Revocable Trust Estate for the purposes and uses hereinafter set forth. . . ." It further stated Grantor

expressly reserves the right, at any time, and from time to time, during [her] lifetime, to alter, amend, and revoke this agreement, in whole or in part, by a duly executed instrument delivered to . . . Trustee. . . . No amendment shall be made, however, which shall in any way increase the obligations of the Trustee hereunder or change his rights or duties without the Trustee's written consent.

Saliently, the Restated Trust has no language revoking the Trust nor does it have language supplanting the Trust or any of the amendments.

In aid of our determination, we find *Rosenblum v. Gibbons,* 685 S.W.2d 924 (Mo.App.1984), to be instructive. In *Rosenblum,* the grantor executed a will and a trust indenture in 1978 which was "revocable and provided for [the] grant-

or's power to amend in whole or in part by written instrument." *Id.* at 926. Several years later in 1981, the grantor executed a second trust indenture which was virtually identical to the 1978 trust indenture and disposed of the same corpus. *Id.* "The only material change consists in the provisions for distribution of assets to the beneficiaries of the trust." *Id.* "The 1981 instrument d[id] not expressly revoke or refer in any way to the 1978 instrument." *Id.* A declaratory judgment action was filed by the trustee of the trust to determine if "the 1981 trust indenture was a valid amendment of the 1978 trust." *Rosenblum*, 685 S.W.2d at 926. The trial court found "the 1981 trust instrument to be a valid amendment of the 1978 trust" and several of the beneficiaries appealed. *Id.* at 926–27. On appeal, the appellate court held that "[t]he 1978 trust indenture provided for amendment by the grantor simply by a written instrument delivered to the trustee and executed by the grantor and the trustee. It is undisputed that the 1981 trust indenture satisfied these formalities." *Id.* at 930. Accordingly, the reviewing court found "the 1981 trust indenture, which complied with the form and manner of exercising the right to amend the 1978 trust indenture, constituted an amendment to the prior indenture and was the only valid and subsisting trust at the time of [the] grantor's death." *Id.*

Here, as in *Rosenblum*, no mention was made of the Restated Trust in Grantor's Fifth and Sixth Amendments to the Trust. Rather, in her Fifth Amendment to the Trust, Grantor referenced the Trust as it was created in 1990; recognized the First, Second, Third, and Fourth Amendments; noted Grantor retained "the right and power, at any time, to amend, alter or modify [the Trust] by an instrument in writing, duly executed and delivered to the Trustee . . .; and expressed Grantor's desire to "amend [the Trust] . . . ." It further "ratified and affirmed" the Trust "except as herein revoked, altered and amended, the [Trust] dated July 10, 1990, as amended October 7, 1991, September 24, 1996, and August 20, 1997, and May 6, 1998 . . . ." It then set out provisions for two equal CRATs: one to benefit Cottey and the other to benefit C of O. The Sixth Amendment, likewise, referred to the Trust created in 1990; made some amendatory provisions; acknowledged the First, Second, Third, Fourth, and Fifth Amendments; set out that Grantor retained "the right and power, at any time, to amend, alter or modify [the Trust] by an instrument in writing, duly executed and delivered to the Trustee . . .;" and expressed Grantor's desire to once again "amend [the Trust] . . . ." The Sixth Amendment also set out that "[e]xcept as herein revoked, altered and amended, the Trust . . . dated July 10, 1990, as amended October 7, 1991, September 24, 1996, August 20, 1997, May 6, 1998, and September 9, 2004 . . . is hereby ratified and affirmed."

As previously related, the Restated Trust did not revoke the 1990 Trust nor did it employ language supplanting that Trust; indeed, by its own terminology it recited that the Restated Trust was but a restatement of the "Trust and all amendments thereto . . . ."

■ "The paramount rule of construction in determining the meaning of a trust provision is that the intent of the grantor is controlling" and " '[t]he grantor is presumed to know and intend the legal effect of the language used.' " *A.G. Edwards Trust Co. v. Miller*, 59 S.W.3d 550, 552 (Mo.App.2001) (quoting *Central Trust Bank v. Scrivner*, 963 S.W.2d 383, 385

(Mo.App.1998)).[8] With her Fifth Amendment, Grantor revived the previously utilized language and format for two CRATs so as to split the residue of her estate equally between the two CRATs. As a matter of law, the Fifth and Sixth Amendments amended the terms of the Restated Trust and the other previous versions of the Trust. *See Rosenblum*, 685 S.W.2d at 930. Cottey established there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. *Hitchcock*, 202 S.W.3d at 699. The probate court's grant of Cottey's motion for partial summary judgment was not in error. C of O's Point I is denied.

In its second point relied on, C of O maintains the probate court erred in entering judgment in favor of Cottey on Count II of its counterclaim "because the judgment is against the weight of the evidence in that the substantial evidence, including medical evidence wrongly discounted by the [probate] court, demonstrates [Grantor's] lack of legal capacity and outweighs the lay testimony relied on by the [probate] court."

In our review of C of O's second point, we initially note that in this court-tried matter our review is governed by Rule 84.13(d) and the principles articulated in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). This Court must affirm the probate court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *In re Thomas L. Harris Trust*, 204 S.W.3d at 270. We review the evidence and all reasonable inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences. *John R. Boyce Family Trust v. Snyder*, 128 S.W.3d 630, 633 (Mo.App.2004). Credibility of the witnesses and the weight to be given to their testimony is for the probate court, which is free to believe none, part, or all of the testimony of any witness. *Taylor–McDonald v. Taylor*, 245 S.W.3d 867, 875 (Mo.App.2008).

▆▆▆ "As in the case of deeds and wills where it is sought to have a trust declared invalid because the settlor lacked the mental capacity to execute a valid trust, the burden is upon those seeking to have it so declared to prove that the settlor lacked such mental capacity at the time settlor executed the trust instrument." *Webb*, 551 S.W.2d at 874. Section 456.6–601, dealing with the capacity of a settlor of a revocable trust, sets out that "[t]he capacity required to create, amend, revoke, or add property to a revocable trust ... is the same as that required to make a will." [9] It has traditionally been held that in order to have testamentary capacity to execute such a document, at the time the document is executed the

---

**8.** We note that C of O argues, based on *Continental Illinois Nat. Bank & Trust Co. v. Art Institute of Chicago*, 409 Ill. 481, 100 N.E.2d 625 (1951), that the Fifth and Sixth Amendments cannot amend or supplant the Restated Trust because those documents failed to specifically mention the Restated Trust. *Continental* is factually distinguishable from the instant matter. While *Continental* involved several amendments to an inter vivos trust, the case centered on the fact that subsequent amendments to the inter vivos trust omitted any reference to a 1936 amendment; yet the probate court affirmed the viability of the 1936 amendment through the use of extrinsic evidence. *Id.* at 629. The reviewing court in *Continental* observed that "[t]here is no merit to the contention that the listing of prior amendments by dates had the effect of reviving those mentioned and revoking those not mentioned." *Id.* Continental is factually distinguishable, involves interpretation of specific Illinois law, and we do not find it to be persuasive.

**9.** All statutory references are to RSMo Cum. Supp.2005.

testator must be able to: (1) understand the ordinary affairs of her life; (2) understand the nature and extent of her property; (3) know the persons who were the natural objects of the bounty; and (4) intelligently weigh and appreciate her natural obligations to those persons and know that she is giving her property to the persons mentioned in the document.[10] *Dorsey v. Dorsey,* 156 S.W.3d 442, 446 (Mo.App.2005); *Glover v. Bruce,* 265 S.W.2d 346, 352 (Mo.1954). " 'Such capacity must exist at the time the will is executed.' " *Allee v. Ruby Scott Sigears Estate,* 182 S.W.3d 772, 781 (Mo.App.2006) (quoting *Morse v. Volz,* 808 S.W.2d 424, 430 (Mo.App.1991)). With that being said, " '[n]o particular degree of mentality is required as long as the testator can adequately consider the requisite features,' " *Allee,* 182 S.W.3d at 781 (quoting *Estate of Hague,* 894 S.W.2d 684, 688 (Mo.App. 1995)), and "[t]he test is the testator's ability 'to comprehend and understand the ordinary, as distinguished from the intricate and complicated affairs of life.' " *Evans v. Stirewalt,* 158 S.W.3d 910, 915 (Mo. App.2005) (quoting *Ahmann v. Elmore,* 211 S.W.2d 480, 488–89 (Mo.1948)).

It is the settled rule of evidence in such cases that occurrences and circumstances close to the time of the execution of the will, both before and after, which tend to shed light on the issue of testamentary incapacity at the time of the execution of the [document at issue], are competent. That said, it is nevertheless not what *may have* been the testator's mental state at the time of the testamentary act that determines legal capacity to [execute the document], but what the mental state *actually was.*

*Morse,* 808 S.W.2d at 430 (emphasis added); *see also Evans,* 158 S.W.3d at 915.

The following evidence was adduced at trial on this issue.[11]

■■■ C of O's expert, Dr. Randall Bateman ("Dr. Bateman"), a neurologist with a specialty in dementia and Alzheimer's disease, testified he reviewed Grantor's medical records and other medical documentation in preparation for his expert testimony on the issue of Grantor's mental or testamentary capacity. Based on those documents, Dr. Bateman testified that to a reasonable degree of medical certainty Grantor suffered from severe dementia and lacked the requisite mental

---

**10.** Additionally, "[m]any Missouri cases confirm the accepted rule that evidence of sickness, old age and eccentric behavior of a testator, taken alone, are not sufficient to overturn [an estate planning document] on the ground of mental incapacity." *In re Estate of Dean,* 967 S.W.2d 219, 223 (Mo.App. 1998).

'Mere proof of illnesses, or imperfect memory, or forgetfulness of names and persons, or old age with its attendant physical and intellectual weaknesses, or mental confusion, or arteriosclerosis, either singly or in combination, unless it further appears that grantor did not understand the nature of the instant transactions, and did not with such understanding voluntarily enter into and consummate the transactions, are insufficient to invalidate [a legal document].'

*Wright v. Kenney,* 746 S.W.2d 626, 631 (Mo. App.1988) (quoting *Vineyard v. Vineyard,* 409 S.W.2d 712, 717 (Mo.1966)).

**11.** We note that at trial C of O introduced over 2,900 pages of Grantor's medical records dating back to 1993. Further, C of O and Cottey elicited substantial testimony from witnesses which detailed Grantor's mental capacity between the years 2000 and her death in 2005. As we are only concerned with "occurrences and circumstances close to the time of the execution of the [Fifth and Sixth Amendments], both before and after, which tend to shed light on the issue of testamentary incapacity at the time of the execution of [those documents]," *Morse,* 808 S.W.2d at 430, we shall only reference evidence dealing with her mental competency during the early fall of 2004.

capacity to execute the Fifth and Sixth Amendments to the Trust in October of 2004. He reached this conclusion based on her lack of orientation to person, time and place; her memory impairment; and her lack of reasoning, judgment, and cognitive function. He felt that, based solely on her medical records, Grantor was incapable of making sound business decisions at that time; she was unable to understand the ordinary affairs of life; she was unable to comprehend the nature and extent of her property; and she was unable to think in an abstract way.

Yvonne Woods ("Ms. Woods"), a home healthcare nurse who aided Grantor following her knee surgeries, testified via deposition that she visited Grantor in the nursing home at some point in November of 2004 and Grantor did not recognize her. She related Grantor claimed to recognize Ms. Woods's daughter although they had never met and she misidentified someone as Brother. Ms. Woods stated she could converse "back and forth" with Grantor, who was always pleasant, but felt that sometimes Grantor did not give appropriate answers.

In addition to the testimony presented, Grantor's medical records were entered into evidence. The records from the nursing home recited that in September of 2004 Grantor often did not know the current season, the location of her room, the fact that she was recovering physically from her surgery or that she was in a nursing home. The nurses noted that during this time period Grantor would ask for her deceased parents; was disoriented to place and time; was occasionally unable to remember Brother's visits; and was sometimes confused. However, it was also noted that she was able to make herself understood and retained good cognitive ability. Further, a doctor at University Hospital noted on September 1, 2004, that

Grantor suffered from "moderate stage dementia" when he was treating her for cervical cancer. The records showed that in October of 2004, although Grantor was cheerful and "visited" with others frequently, she continued to ask for her deceased parents; was disoriented to place and time; removed her urostomy and colostomy bags herself; was confused; and was sometimes unable to follow directions.

On the other hand, Jadene Corum ("Ms. Corum"), a registered nurse and the director of the nursing home in which Grantor resided, testified that she interacted with Grantor regularly during the time period at issue and that Grantor's long term memory remained "good and consistent" during September and October of 2004. She related that Grantor "recalled friends that she hadn't seen for some time when they would come to visit, she could talk about things that happened in the community from years past" and she recognized and interacted with her family. Ms. Corum also testified that Grantor was able to make herself understood, tracked and participated in conversations with staff and visitors, and was "at ease interacting with others, she was at ease doing self initiated activities. . . ." Ms. Corum further related that on September 11, 2004, Grantor had participated in the Chief Sarcoxie day parade, had ridden on a parade float, and discussed it with the staff for some time afterwards.

Brother, who visited Grantor in the nursing home "[t]hree times a day, seven days a week," testified that in September and October of 2004 Grantor was "just fine;" she was "[m]ainly" "mentally alert;" she read her mail and the local newspaper on a daily basis; and her mental state was "[a]s sharp as it had been." He related Grantor was able to joke with him, could hold intelligent conversations, was easy to understand on most occasions, and even

kept abreast of her stock market investments. He related that Grantor directed him to handle the preparation of the Fifth and Sixth Amendments and she conveyed her desires to the attorney, Kevin Checkett ("Mr. Checkett"), personally. Brother testified that in his opinion Grantor had the requisite mental capacity to execute the Fifth and Sixth Amendments.

Mr. Checkett testified that the majority of the estate planning information he received in preparation for drafting the Fifth and Sixth Amendments came from Brother although he had met Grantor on prior occasions and spoke with her for 15 to 30 minutes at the nursing home on the days she signed the aforementioned amendments. He stated he had general conversations with Grantor during his two meetings with her and it "never occurred to [him] that [Grantor] might not be competent" based on his interactions with her. He stated in dealing with Grantor he felt that she was physically failing "but everything else, her manner, her speech, she was always bright, alert. . . ." Mr. Checkett likewise related he had no doubt Grantor understood the Fifth and Sixth Amendments, that she intended those documents to be a valid disposition of her property, and that she was competent when she signed them.

Cottey's expert, Dr. Jeffrey Burns ("Dr. Burns"), testified that he had reviewed the same medical records relied upon by Dr. Bateman and he opined that a diagnosis of Grantor's mental capacity based on reviewing her medical records was not an accurate way to make a diagnosis of dementia or Alzheimer's disease. He explained that Dr. Bateman's diagnosis, based solely on the medical records of a deceased person, was an inaccurate scientific method for making such a determination and that, regardless, Grantor's medical records did not

support Dr. Bateman's finding that Grantor was suffering from severe dementia and Alzheimer's disease. Dr. Burns concluded that looking solely at the medical records he was unable to determine conclusively whether Grantor had the requisite mental capacity to execute the Fifth and Sixth Amendments, but the records he examined supported his belief that she did have capacity.

Doris Bloss ("Ms. Bloss"), who was Grantor's roommate at the nursing home and also witnessed the Fifth Amendment, testified that she was quite friendly with Grantor and had spent much time talking about their "growing up days, [their] school days, what [they] would get into, and just [their] home life in general." She related at the time she executed the Fifth and Sixth Amendments, Grantor was mentally competent; could make her own informed medical and financial decisions; and informed Ms. Bloss she knew what she was doing in signing the document.

Dr. Debra Royce ("Dr. Royce"), a physician who formerly treated Grantor and a family friend for over forty years, testified via deposition that she visited Grantor in the nursing home at least once per week. She also related that at some point in 2003 she had prescribed Aricept, an Alzheimer's drug, for Grantor to try after she complained of forgetfulness following her knee surgery.[12] She related that "till her dying day [Grantor] knew exactly what her monetary status was" and that while Grantor may have been suffering from mild dementia, she had the requisite mental capacity around the time she signed the Fifth and Sixth Amendments.

Here, Mr. Checkett, Brother, and Ms. Bloss were all present on the date Grantor signed the Fifth Amendment and all testi-

12. Grantor apparently took this medicine for a month to two months.

fied that she had the requisite mental capacity to execute such a document. Further, Ms. Corum and Dr. Royce had all seen Grantor within a week of her signing the Fifth Amendment and testified that she had the requisite mental capacity to have executed the trust instruments at that time. Likewise, regarding the signing of the Sixth Amendment, Brother and Mr. Checkett testified they saw her on that day and she had the requisite mental capacity to do so. Further, Ms. Corum and Dr. Royce saw her the week she executed the Sixth Amendment and opined that she had the requisite mental capacity to do so. Additionally, Dr. Burns testified that based on his review of Grantor's medical records he opined that while he could not conclusively make such a ruling, it appeared that based on the evidence he reviewed she most likely had the requisite mental capacity in the early fall of 2004.

▆▆▆ C of O argues that "the undisputed medical evidence showed [Grantor] lacked capacity" such that the probate court's reliance on the lay person testimony of people who actually witnessed the transactions at issue was in error. C of O's argument is fundamentally flawed in that the credibility of the witnesses and the weight to be given to their testimony is for the probate court, which is free to believe none, part, or all of the testimony of any witness. *Taylor–McDonald*, 245 S.W.3d at 875. This includes the testimony of expert witnesses. *See Patton v. Patton*, 973 S.W.2d 139, 147 (Mo.App.1998) (holding that the trial court was in the best position to judge the credibility of the wit-

nesses and was free to reject the expert testimony provided by a party). As in *Goodnight v. Curry*, 618 S.W.2d 278, 279 (Mo.App.1981):

> [the parties] presented lay and medical testimony, including that from apparently disinterested witnesses, that decedent was of sound mind and competent to make a will at the time the will was executed. Plaintiffs offered lay and medical testimony that decedent was not competent at that time. The trial court chose to believe defendants' evidence. Where there is conflicting testimony we give deference to the trial court's conclusions.

Similar to the situation in *Goodnight*, C of O here offered the testimony of its expert Dr. Bateman and other witnesses, as well as the medical records of Grantor. This evidence and testimony were found by the probate court to be less credible than the expert opinion of Dr. Burns and Dr. Royce and the lay testimony offered by Mr. Checkett, Brother, Ms. Bloss and Ms. Corum. The probate court was within its province to make such a decision. Here, C of O failed to meet its burden of proving that Grantor lacked the requisite testamentary capacity. *Webb*, 551 S.W.2d at 874. The probate court did not err in finding Grantor had the requisite mental capacity to execute the Fifth and Sixth Amendments to the Trust. C of O's Point II is denied.[13]

▆▆▆ C of O's last point relied on asserts the probate court erred in denying C of O's motion for summary judgment

---

**13.** We note C of O also argues the probate court erred in stating there is a rule "that an expert's testimony based on review of medical records is inadequate to prove incapacity." While the probate court may have made such a pronouncement in its lengthy Judgment, this Court is concerned only with the correctness of the result reached by the probate

court and such a judgment will be supported on any reasonable ground. *See In re Estate of Dawes*, 891 S.W.2d 510, 522 (Mo.App.1994); *In re Estate of Schooler*, 204 S.W.3d 338, 347 (Mo.App.2006). Based on our findings in this point relied on, this argument lacks merit and does not affect our determination.

regarding Count III of its counterclaim "because of mootness in that the [probate] court's ruling was the result of error." Here, C of O acknowledges the general rule that the denial of a motion for summary judgment is not appealable,[14] but argues that the denial of its motion for summary judgment should be reviewed if this Court determines the probate court ruled incorrectly in either Point I or Point II. In that we are affirming the probate court's rulings as it relates to those points, we need not consider whether C of O's motion was sufficiently intertwined with that filed by Cottey such that it would warrant our review. C of O's Point III is denied.

We turn now to Cottey's two points relied on. In its first point relied on, Cottey asserts the probate court "erred in awarding attorneys' fees to [C of O]." In its second point relied on, Cottey maintains the probate court "erred in awarding attorneys' fees out of [Cottey's] share of the Trust." Being interrelated we shall address these points conjunctively.

In its Amended Judgment, the probate court set out specific amounts for each of the attorney's fees to be paid from the Trust prior to distribution to the CRATs: attorney's fees for Cottey in the amount of $316,497.67; attorney's fees for C of O in the amount of $381,680.20; attorney's fees in the amount of $6,405.00 for the guardian ad litem of one of the beneficiaries; and attorney's fees for Ms. Cunningham in the amount of $38,710.28.

We recognize that Missouri has adopted the "American Rule" which provides that

"absent statutory authorization or contractual agreement, with few exceptions, each party bears the expense of his or her own attorney's fees." *Klinkerfuss v. Cronin*, 199 S.W.3d 831, 843 (Mo.App.2006). Section 456.10–1004 of the Missouri Uniform Trust Code provides:

> [i]n a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.

 As in this matter, "[w]here the legislature statutorily authorizes an award of attorney's fees in the discretion of the trial court … the granting or refusal to grant attorney's fees is reviewable for an abuse of discretion." *Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 170 (Mo.App.2006) (internal citation omitted). "The trial court abuses its discretion in awarding attorney's fees when its award is 'either arbitrarily arrived at or so unreasonable as to indicate indifference and lack of proper judicial consideration.' " *Id.* (quoting *Tate v. Golden Rule Ins. Co.*, 859 S.W.2d 831, 835 (Mo.App.1993)). "An award of attorney's fees is presumed to be correct, with the burden on the complaining party to prove otherwise." *Scott*, 215 S.W.3d at 170. "When reviewing a challenge to an award of attorney's fees, we give 'deference to the discretion of the trial judge who, by virtue of his or her office and experience, is considered an expert in

14. Generally, an order denying a motion for summary judgment is not an appealable order. *Helenthal v. Lathrop & Gage, L.C.*, 272 S.W.3d 302, 303 (Mo.App.2008). "This is true even if the denial occurs at the same time summary judgment is granted to the other party." *Jones v. Landmark Leasing, Ltd.*, 957 S.W.2d 369, 373 (Mo.App.1997). With that being said, there is a recognized exception to this general rule. An order denying a motion for summary judgment may be reviewed on appeal when the merits of the motion are intertwined with the propriety of an appealable order granting summary judgment to another party. *Helenthal*, 272 S.W.3d at 303.

determining the proper amount of compensation for legal services.'" *Id.* (quoting *Tate,* 859 S.W.2d at 835).

There is scant case law interpreting section 456.10–1004 and, in fact, there are only two published cases discussing this statute. Recently in *Klinkerfuss v. Cronin,* 289 S.W.3d 607, 617–18 (Mo.App.2009) (internal citation omitted), the Eastern District of this Court stated:

> [t]his section took effect in 2005, and we have found no Missouri appellate decision construing it or analyzing its application. In *Kutten v. Bank of Am., N.A.,* however, the federal district court found that section 456.10–1004 provided an independent basis to award attorney's fees to the defendant. Stating that the statute's language was plain, the court rejected the plaintiff beneficiaries' argument that it applied only in the case of bad faith or egregious conduct.
>
> Section 456.10–1004 applies here because this suit involves administration of a trust. The plain language of section 456.10–1004 provides that any party ... may be ordered to pay attorneys' fees as justice and equity require. Justice and equity recommend such an award here. Otherwise, either the innocent beneficiary, who had no part in the litigation, would find her share of the trust depleted due to her sister's vexatious litigation, or the trustee would have to personally bear the expense for performing his duty to the trust.

Likewise, *Blue Ridge Bank and Trust Co. v. McFall,* 207 S.W.3d 149, 162 (Mo.App. 2006), referenced section 456.10–1004, in a case where the parties were already awarded attorney's fees by the probate court and then "requested attorney's fees and costs for the work done in obtaining a

determination and interpretation of the trusts on this appeal." The reviewing court found that because "[t]he probate division has already exercised discretion as to the attorney fee issues for services and expenses prior to appeal," "it is appropriate to remand these issues to the Probate Judge to allow her an opportunity to again exercise her discretion as to these motions." *Id.*

■ Here, as in *Klinkerfuss* and *Blue Ridge,* under the special statutory section at issue the probate court could within its discretion award attorney's fees "to any party" regardless of whether that party prevailed in the lawsuit. § 456.10–1004. The probate court here reasoned that this litigation was brought and defended in good faith and there were issues raised which could only have been settled via judicial determination. As such, it was within the probate court's discretion to award attorney fees to C of O under section 456.10–1004. The probate court did not abuse its discretion in making such an award.[15] *Scott,* 215 S.W.3d at 170.

Cottey next takes issue with the probate court's decision to pay C of O's attorney's fees from the Trust prior to dividing the residue into the CRATs. Cottey argues that C of O's attorney's fees should instead be paid out of C of O's portion of the Trust after the residue is divided into the CRATs.

As stated in section 456.10–1004, at the discretion of the probate court an award of attorney's fees may "be paid ... from the trust that is the subject of the controversy." There is no case law cited by either party which requires the probate court to order an award of attorney's fees to be paid out of the Trust *before* distribution to

---

**15.** We note Cottey does not take issue with the amount of the probate court's award. are denied.

the beneficiaries or *after* the distribution to beneficiaries. Such specific determinations are the province of the probate court within its sound discretion. § 456.10–1004; *Scott*, 215 S.W.3d at 170. We cannot convict the probate court of error in this matter. The probate court's stated decision was well-reasoned and thorough. The probate court did not abuse its discretion in ordering C of O's attorney's fees to be paid from the Trust prior to the residue being distributed into the CRATs. Cottey's two points are denied.

The judgment of the probate court is affirmed.

BATES, P.J., and BURRELL, J., Concur.